UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY

IN RE:

| | |
|---|---|
| LICKING RIVER MINING, LLC | CASE NO. 14-10201 |
| LICKING RIVER RESOURCES, INC. | CASE NO. 14-10203 |
| S. M. & J., INC. | CASE NO. 14-10220 |
| | (ASHLAND DIVISION) |
| | |
| FOX KNOB COAL CO., INC. | CASE NO. 14-60619 |
| J.A.D. COAL COMPANY, INC. | CASE NO. 14-60676 |
| | (LONDON DIVISION) |
| | |
| ALLEGED DEBTORS | CHAPTER 11 |
| | |
| | (JOINT ADMINISTRATION |
| | APPLICATION PENDING) |

## DECLARATION OF JOHN COLLINS IN SUPPORT
## OF DEBTORS' FIRST DAY PLEADINGS

John Collins declares and says:

1.      I am the Chief Executive Officer ("CEO") and director for each of the above-referenced alleged debtors, Licking River Mining, LLC ("LR Mining"), Licking River Resources, Inc. ("LRR"), S. M. & J., Inc. ("SM&J"), Fox Knob Coal Co., Inc. ("Fox Knob"), and J.A.D. Coal Company, Inc. ("JAD"), as alleged debtors (collectively, the "Debtors" and each a "Debtor").  I have held these positions since May 2011.   In that capacity, I am familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

2.      As CEO, I am responsible for, among other duties and responsibilities, overseeing all financial aspects of the Debtors' business, including, financial reporting and internal controls, financial planning, taxation and risk management.

3.      I have worked in the coal industry for 20 years, holding various positions, 18 of which were spent in an executive capacity.  My experience in the coal industry includes positions

1

in operations, sales and marketing, project development, as well as founding and owning my own coal business.  My experience includes successfully leading organizations undergoing rapid change or transition.

4.    My employment with U.S. Coal Corporation ("U.S. Coal" or the "Company") began during 2007 when my partners and I sold our businesses (now known as the LRR Division) to U.S. Coal. After this transaction, I continued as President of the LRR Division. After the departure of the former CEO of U.S. Coal in 2011, I agreed to accept his position overseeing the entirety of U.S. Coal's operations.

5.    I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the Debtors' first-day motions and applications filed contemporaneously herewith (the "First Day Motions"). I have reviewed the First Day Motions or have otherwise had their contents explained to me, and I believe that the relief sought in the First Day Motions is necessary to enable the Debtors to operate in Chapter 11 with minimum disruption to their operations and minimum loss of value.

6.    Except at otherwise indicated, all the facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by other members of the Debtors' management or professionals, upon information learned from my review of the relevant documents, or opinion based upon my experience and knowledge of the Debtors' operations and financial condition and my experience in the coal industry generally.  If called as a witness, I could and would testify to the facts set forth in this Declaration.  Unless otherwise indicated all financial information contained herein is on a consolidated and unaudited basis.

### Filing of Involuntary Chapter 11 Cases

7.    On May 22, 2014 (the "LR Mining Commencement Date"), an involuntary petition seeking relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") was filed against LR Mining.  On May 23, 2014 (the

15013559.2

"LRR/Fox Knob Commencement Date"), involuntary petitions seeking relief under Chapter 11 of the Bankruptcy Code were filed against LRR and Fox Knob.  On June 3, 2014 (the "SM&J Commencement Date"), an involuntary petition seeking relief under Chapter 11 of the Bankruptcy Code was filed against SM&J.   On June 4, 2014 (the "JAD Commencement Date," and together with the LR Mining, LRR/Fox Knob, and SM&J Commencement Dates, the "Commencement Dates"), an involuntary petition seeking relief under Chapter 11 of the Bankruptcy Code was filed against JAD.  The foregoing involuntary petitions are collectively referred to as the "Involuntary Petitions."

8.      In response to the Involuntary Petitions, on June 9, 2014, the Debtors acknowledged that they did not have a defense to allegations contained by filing their Consolidated Answer and Consent to Entry of Order for Relief and Reservation of Rights (the "Answer").   The Debtors anticipate that the Court will enter an order for relief in these bankruptcy cases in the near future, and the date that the order for relief is entered is hereinafter referred to as the "Relief Date."  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

9.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

10.     The Debtors hope that moving quickly past the Involuntary Petitions will enable the Debtors to concentrate their attention on maximizing the value of their assets for the benefit of creditors and parties in interest (employees, environmental authorities, taxing authorities, contract counter parties, etc.).

15013559.2

11.     Part I of this declaration describes the Debtors' businesses and the Debtors' prepetition restructuring initiatives, Part II describes the circumstances giving rise to the commencement of these Chapter 11 cases, and Part III sets forth the relevant facts in support of the First Day Motions.

## I.

## <u>The Debtors' Businesses</u>

### A.  Operations

12.     The principal business of U.S. Coal is the production and sale of (1) thermal coal purchased primarily by utilities and trading companies and (2) specialty coal purchased by various industrial customers and trading companies (known as "stoker" coal). The Company also has seams containing metallurgical coal but currently does not have active mining operations to produce this type of coal. U.S. Coal supplies different qualities of coal to a variety of customers located primarily in the Midwestern and Southeastern United States.

13.     U.S. Coal operates through two divisions (previously independently owned and operated).  The first is the Licking River Division ("<u>LRR Division</u>") that was formed through the acquisition of Debtors LR Mining, LRR, and S.M. & J., and non-debtor Oak Hill Coal, Inc. ("<u>Oak Hill</u>") in January 2007 for approximately $33 million.  Of the $33 million of consideration paid for the LRR Division's assets, $10 million was in the form of unsecured notes (the "<u>LRR Notes</u>").  The LRR Notes are unsecured obligations of U.S. Coal.

14.     The second division of U.S. Coal, the J.A.D. Division (the "<u>JAD Division</u>"), was formed through the acquisition of Debtors JAD and Fox Knob, and non-debtors Sandlick Coal Company, LLC ("<u>Sandlick</u>") and Harlan County Mining, LLC ("<u>Harlan Mining</u>") in April 2008. The original purchase price for the JAD Division's assets was approximately $41 million, $7

million of which was paid in the form of secured notes, which have a first lien on certain assets that existed at that time of the transaction.

15.     Both the LRR Division and the JAD Division are located in the Central Appalachia region of eastern Kentucky.  The LRR Division has approximately 26.3 million tons of surface reserves under lease.  The JAD Division has approximately 24.4 million tons of surface reserves, both leased and owned real property.

16.     At present, U.S. Coal has three surface mines in operation between the LRR Division and JAD Division.  All three of these surface mines also have contour and highwall mining operations, in addition to area mining operations.  Highwall mining operations have grown in importance to the Company as these techniques are able to efficiently capture economies of scale and lower the overall cost of production.

17.     At the LRR Division, the Company currently contracts with a third party to provide the use of its two highwall miners, which it pays for based on production.  At the JAD Division, the Company uses its own employees and highwall miner to access its coal reserves.

18.     The LRR Division leases a 300 ton per hour coal preparation facility that was completed in 2008. This facility is operated under an operations and maintenance agreement with a third party. The JAD Division owns a 400 ton per hour coal preparation facility, which is operated by the same third party under a similar operations and maintenance agreement.

19.     The majority of U.S. Coal's revenues are from sales under contractual agreements, which are negotiated with utilities and trading companies.  The Company also makes spot market sales based on its inventory levels, which are driven by daily market prices.

20.     The LRR Division ships coal domestically to utility customers, trading companies, and industrial customers by rail or barge on the Big Sandy River.  The Company

believes that the LRR Division is strategically important to trading companies as it is one of the largest producers in near proximity to the Big Sandy River, one of the two delivery points for the Central Appalachian Coal futures contract, which trades on the NYMEX commodities exchange. As such, the LRR Division derives the greatest percentage of coal sales from trading companies at present.

21.     The JAD Division ships coal domestically to utility customers, trading companies, and industrial customers primarily by rail as its property lies in the heart of the CSX rail network, with access to the Norfolk Southern network in near proximity.  The use of a rail load out facility owned by the JAD Division in near proximity to surface mining operations provides the JAD Division natural transportation cost advantages.  Due to the natural properties of coal mined by the JAD Division, in addition to the attractive logistics, southeastern utilities find its coal particularly attractive and account for the majority of the JAD Division's revenues. Additionally, certain industrial customers and trading companies purchase its specialty coal at prices between $70 and $150 per clean ton.

22.     For the fiscal year ending December 31, 2013, U.S. Coal estimates sales of 2.6 million tons of coal, of which it produced 1.9 million tons and purchased 0.7 million tons from third parties.  These sales resulted in $187.6 million of revenues, $13.0 million of EBITDA, and a net loss of $6.0 million.  For the same fiscal period, interest expense was $5.2 million. These figures are unaudited.

23.     U.S. Coal and its subsidiaries employ approximately 293 employees (approximately eight of which are employees of U.S. Coal and 285 of which are employees of its subsidiaries).   These employees include engineers, miners, accountants, supervisory staff, administrative staff, managers, mechanics, and executives.  The Company provides health care

6

and other benefits to these employees, which are paid for by U.S. Coal on behalf of itself and its subsidiaries.  None of the Company's employees are unionized and the Company has no defined-benefit retirement plans.  The Debtors are subject to workman's compensation insurance laws.

### B.  Operational Initiatives

24.     In an effort to reduce costs of production, increase operational efficiencies, and increase revenues, U.S. Coal undertook a number of operational initiatives over the past two years.  The efforts included the closing of smaller operations, including the Pathfork surface operations and the Whitesburg and Diablo 2A underground operations.

25.     Additionally, the Company terminated 70 employees, most of whom were employed at the JAD Division.  U.S. Coal also made company-wide salary and benefits reductions including a ten percent (10%) reduction in wages for hourly personnel and up to a fifteen percent (15%) reduction in wages for salaried employees.  Also, the Company increased the required contribution for health benefits by employees by twenty percent (20%).

26.     In an effort to reduce operating costs, the Company renegotiated service contracts with a number of its vendors at both the LRR Division and the JAD Division.  The Company also entered into a coal processing agreement with another industry producer at LRR that positively affected production cost for that division.

27.     In addition to those cost-reduction measures discussed above, the Company took steps in 2014 in an effort to further reduce its costs of production.  These measures included: (i) renegotiation of the Company's lease rates with its mineral rights owners, (ii) further renegotiation of the Company's service contracts and terms with vendors, (iii) reduction of debt service requirements (both of principal amortization and interest obligations) by refinancing

equipment notes, and (iv) renegotiation of plant operation and maintenance agreements with the third party that operates the coal preparation plant at the LRR Division and the JAD Division.

28.    The Company also undertook certain efforts to produce and sell additional quantities of stoker coal in 2014.  These initiatives resulted in increased stoker sales at both the LRR Division and the JAD Divisions, ranging in prices of approximately $70–$150 per ton. The Company also entered a new agreement with a customer pursuant to which the Company agreed to sell such party 30,000 tons of coal per month at $67.00/ton from the LRR Division.  This agreement, which expires by its terms in September 2014, is renewable by mutual consent.

29.    Despite these operational initiatives, mining ratios were unfavorable during the first fiscal quarter of 2014 at the LRR Division for a number of reasons including the unexpected discovery at one operation of extensive underground mining that was not mapped by previous mining operations.  The unexpected presence of these underground mines resulted in a need to process more yards per ton of coal and less favorable ratios.  At the same time, production costs were driven upwards.

30.    Also in early 2014, mining operations at a separate operation were reconfigured in preparation for a new high wall miner operation.  While this shift in focus to areas more favorable to high wall mining is expected to reap benefits in 2014, it resulted in short-term development and operational costs.

31.    Going forward, the Company believes it can improve mining efficiency and ratios.  First, greater efficiency should result from mining more favorable areas that are now near completion.  The Company believes that the unfavorable ratios experienced in the first quarter of 2014 were necessary to access lower ratio areas.  Based upon the size of the reserves and planned production, this area should be active through all of calendar year 2014.  Additionally, the

Company has completed an extensive exploration program to ensure that the conditions previously encountered do not exist in these new areas of operation. Further, exploration drilling was conducted more extensively than in the past to validate existing reserves.

32.     Second, the Company is shifting its operational focus from area mining to contour and highwall mining projects, which are expected to lower mining ratios by decreasing the amount of overburden that must be moved to extract a ton of coal. Production costs should improve as a result of the decreased mining ratios.

33.     Third, high wall miners will increase production while reducing the overall mining costs, resulting in a lower blended cost per ton. Because most tons recovered by the high wall miners are washed (processed), the resulting product is of a higher quality, ultimately earning higher realized sale prices.

### C.  Corporate Structure

34.     U.S. Coal is the sole shareholder or sole member, as applicable, of each of the Debtors and is the direct or indirect parent of each of the other non-debtor entities in the LRR Division and the JAD Division. The LRR Division is comprised of Debtors LR Mining, LRR, and SM&J, and non-debtor Oak Hill, each of which is organized under the laws of the state of Kentucky. The JAD Division is comprised of Debtor JAD, a Virginia corporation, and Debtor Fox Knob, a Kentucky Corporation, and non-debtor Sandlick, which is a Virginia limited liability company.

35.     In addition, U.S. Coal is the direct parent of each of the non-debtor entities Harlan County Mining, LLC, a Kentucky LLC, and U.S. Coal Marketing, LLC ("USCM"), a Delaware limited liability company.

36.     Schedule A attached hereto generally depicts the Debtors' overall corporate structure and their relationship to the non-debtor entities.

## D. Capital Structure

37.     As of May 1, 2014, U.S. Coal had approximately $75.0 million of liabilities (excluding asset retirement and capital lease obligations).  Of this $75.0 million, approximately $46.4 million was comprised of secured debt, including secured equipment financing, certain put right holders (whose claims are disputed), and Pryor Cashman LLP ("Pryor Cashman").  The balance of approximately $28.6 million is comprised of obligations to trade creditors and holders of certain unsecured notes.

38.     U.S. Coal was originally formed in 2006 to capture perceived valuation differences between private market transactions in Central Appalachia and public market equity valuations.  The Company's sponsors intended to use funds raised through various equity and debt issuances to acquire operating companies in the coal mining industry. After these acquisitions were integrated, the Company envisioned a public equity listing to offer liquidity to investors.

39.     Due to the Company's genesis as a fund raising vehicle, many concessions were made that were reflective of the high risk nature of the venture and the short-term plan to issue public equity.   These included: (1) high interest rates on unsecured debt; (2) strict debt covenants; (3) convertible preferred equity with equity "kickers"; and (4) management rights offering superior control to specific equity classes, among others.

40.     As described in more detail below, these concessions, among other factors, played a significant role in restricting the Debtors' ability to raise equity, sell the company, merge the company with strategic partners, or make any significant capital decisions.  These restrictions

drastically reduced the Company's financial flexibility during the recent industry downturn. The Company's capital structure needs to be addressed to enable the Company to successfully reorganize and emerge as a successful entity.

    **(i)**    **Secured Debt**[1]

41.    The structure of the Debtors' pre-Petition secured debt is complex.

42.    On December 7, 2011, in addition to incurring new debt, U.S. Coal and its subsidiaries paid off, refinanced, or restructured certain non-equipment financing debt (the "2011 Refinancing").

**JAD Sellers**

43.    Aubra Paul Dean, Carl E. McAfee, and Julia McAfee (the "JAD Sellers") received a portion of the purchase price for the sale of the JAD Division to U.S. Coal in the form of notes, which were subsequently amended and restated as part of the 2011 Refinancing:

- Second Amended and Restated Convertible Note, dated December 7, 2011, of J.A.D. Coal Company, Inc., in the original principal amount of $2,852,578, held by the estate of Aubra Paul Dean ("Dean JAD Seller Note");

- Second Amended and Restated Convertible Note, dated December 7, 2011, of J.A.D. Coal Company, Inc., in the original principal amount of $2,852,578, held by Carl E. McAfee and Julia McAfee as tenants by the entirety ("McAfee JAD Seller Note");

- Second Amended and Restated Promissory Note, dated December 7, 2011, of J.A.D. Coal Company, Inc., in the original principal amount of $500,000, held by the estate of Aubra Paul Dean ("Dean Value Differential Note");

- Second Amended and Restated Promissory Note, dated December 7, 2011, of J.A.D. Coal Company, Inc., in the original principal amount of $500,000,

---

[1]    The amounts set forth as "secured debt" are characterized as such for informational purposes in connection with this Declaration and the related First Day pleadings. The Debtors' expressly reserve all of their rights with respect to the obligations described herein, including, without limitation, the right to contest the extent, validity and priority of any lien asserted against the Debtors' assets. Moreover, certain the secured obligations described herein are subject to various intercreditor agreements between and among the various parties.

held Carl E. McAfee and Julia McAfee as tenants by the entirety ("McAfee Value Differential Note").

44.    The Dean JAD Seller Note and the McAfee JAD Seller Note are secured by a first priority lien (subject to those of Existing Lenders (as defined below), to the extent still existing) on the assets of, and stock/interests of, the companies constituting the JAD Division pursuant to the following agreements:[2]

- Security Agreement, dated April 15, 2008, among JAD, Sandlick, Fox Knob, Carl and Julia McAfee, and Aubra Paul Dean (granting a security interest in equipment and interests in real estate); and

- Security Agreement, dated April 15, 2008, among the Company, Carl and Julia McAfee, and Aubra Paul Dean (granting a security interest in the stock/interests of the JAD, Fox Knob, and Sandlick subsidiaries).

## East Coast Miner LLC

45.    The Debtors are parties to the following credit agreement and note with East Coast Miner LLC ("ECM I"):

- Second Amended and Restated Credit Agreement, dated August 29, 2008, among U.S. Coal, as borrower, LRR, LR Mining, Oak Hill, SM&J, JAD, Fox Knob, Sandlick, Harlan, and USCM, as guarantors, Wilmington Trust Company ("WTC"), as collateral agent, and ECM I, as lender, subsequently assigned to ECM I (as amended, the "ECM I Credit Agreement"); and

- Amended and Restated Secured Note, dated September 30, 2009, made by U.S. Coal in favor of ECM I in the original principal amount of $24,018,269.60 (the "ECM I Note").[3]

46.    The Debtors are parties to the following security agreements under the ECM I Credit Agreement: (i) Amended and Restated Security Agreement, dated August 29, 2008, made by U.S. Coal, LRR, LRM, Oak Hill, SM&J, JAD, Fox Knob, Sandlick, Harlan, and USCM, as

---

[2]    The Dean Value Differential Note and the McAfee Value Differential Note are unsecured.

[3]    The note that eventually became the EMC I Note was originally issued in the face amount of $13 million pursuant to a secured note with Fursa Alternative Strategies, LLC.  The principal amount grew to $24 million as a result of a series of refinancings.

grantors, in favor of WTC, as collateral agent (as amended, the "ECM I Security Agreement")

and (ii) certain mortgages and deeds of trust.

47.     Pursuant to the ECM Security Agreement, each grantor granted WTC, as

collateral agent, a security interest in all of its rights, title, and interest in and to all of its property

and assets, whether then owned or thereafter acquired.

48.     The security interests of ECM I in the assets and stock/interests of the entities in

the JAD Division are subject to the JAD Intercreditor Agreements (as defined below).

### East Coast Miner II LLC

49.     The Debtors are parties to the following credit agreement and note with East

Coast Miner II LLC ("ECM II"):

- Credit Agreement, dated December 7, 2011, among U.S. Coal, JAD, Sandlick, and Fox Knob, as borrowers; LRR, Oak Hill, SM&J, LR Mining, Harlan, and USCM, as guarantors; WTC, as collateral agent; and ECM II, as lender (the "ECM II Credit Agreement");

- Secured Note, dated December 7, 2011, made by U.S. Coal in favor of ECM II in the original principal amount of $1,322,406.38; and

- Secured Note, dated December 7, 2011, made by JAD, Sandlick, and Fox Knob in favor of ECM II in the original principal amount of $5,407,016.22.

50.     The Debtors are parties to the following security agreements under the ECM II

Credit Agreement: (i) Security Agreement, dated December 7, 2011, made by U.S. Coal, LRR,

LRM, Oak Hill, SM&J, JAD, Fox Knob, Sandlick, Harlan, and USCM, as grantors, in favor of

WTC, as collateral agent (as amended, the "ECM II Security Agreement"), and (ii) certain

mortgages and deeds of trust.

51.     Pursuant to the ECM II Security Agreement, each grantor granted WTC, as

collateral agent, a security interest in all of its rights, title, and interest in and to all of its property

and assets, whether then owned or thereafter acquired.

13

15013559.2

52.     The security interests of ECM II in the assets and stock of the JAD Division are subject to the 2011 Stock Intercreditor Agreement and the 2011 Asset Intercreditor Agreement (as defined below).

### Dean McAfee Holdings, LLC

53.     At the time of the 2011 Refinancing, the Debtors required an additional $975,027.66, which was lent by Dean McAfee Holdings, LLC pursuant to a Note, dated December 7, 2011, by JAD to Dean McAfee Holdings, LLC, in the original principal amount of $975,027.66 (the "McAfee Note").

54.     Pursuant to the McAfee Note, a security interest in the assets of JAD, Fox Knob, and Sandlick, and in the stock and membership interests of these entities, was granted pursuant to (i) Security Agreement, dated December 7, 2011, among JAD, Fox Knob, Sandlick, and Dean McAfee Holdings, LLC; and (ii) Security Agreement, dated December 7, 2011, between U.S. Coal and Dean McAfee Holdings, LLC.

55.     Pursuant to the JAD Intercreditor Agreements (as defined below), the security interests were granted the same priority as those of the original notes of the JAD Sellers pursuant to the sale of the JAD Division to U.S. Coal.

### Goodwin and Goggin Secured Notes

56.     U.S. Coal also has the following outstanding secured notes in favor of Keith Goggin and Michael Goodwin: (i) Third Amended and Restated 12% Secured Note due October 31, 2014, dated February 1, 2013, by U.S. Coal in favor of Keith Goggin in the aggregate principal amount of $1,097,620.03 (the "Goggin Note"); and (ii) Third Amended and Restated 12% Secured Note due October 31, 2014, dated February 1, 2013, by U.S. Coal in favor of Michael Goodwin in the aggregate principal amount of $1,097,620.03 (the "Goodwin Note").

57.    The Goggin Note and the Goodwin Note are secured by liens on certain equipment and real estate of U.S. Coal and its subsidiaries pursuant to the following security agreements: (i) Security Agreement, dated as of February 1, 2013, made by U.S. Coal, JAD, Sandlick, Fox Knob, LRR, Oak Hill, SM&J, LR Mining, Harlan, and USCM in favor of WTC, as collateral agent for Keith Goggin; (ii) Security Agreement, dated as of February 1, 2013, made by the Company, JAD, Sandlick, Fox Knob, LRR, Oak Hill, SM&J, LR Mining, Harlan, and USCM in favor of WTC, as collateral agent for Michael Goodwin; and (iii) certain mortgages and deeds of trust.

58.    The Goggin Note and the Goodwin Note are not subject to any of the intercreditor agreements discussed below.

**Pryor Cashman Note**

59.    In connection with a dispute related to legal fees incurred prior to the Relief Date, the Company and Pryor Cashman entered into that certain Settlement Agreement, dated March 4, 2013 (the "Pryor Cashman Settlement").  Pursuant to the Pryor Cashman Settlement, as part of the settlement for legal fees, pursuant to an arbitral award, the Company entered into a Secured Promissory Note, dated March 4, 2013, by the Company to Pryor Cashman, in the original principal amount of $2,204,714.13.

60.    Pursuant to a Security Agreement (the "Pryor Cashman Security Agreement") of even date with the Pryor Cashman Settlement, among the Company, LRR, Oak Hill, SM&J, LR Mining, JAD, Sandlick, Fox Knob, and Pryor Cashman, the grantors granted a security interest to Pryor Cashman in specified collateral including all personal and fixture property, all deposit accounts, all commercial tort claims, securities and all other investment property, and general intangibles.  The security interest  granted under the Pryor Cashman Security Agreement is

15

subordinate to the security interests that existed as of February 18, 2013 (which would include the interests discussed above), security interests that come into existence by no action of the grantors subsequent to such date, and purchase money security interests.

### Intercreditor Agreements

61.    The assets of the entities comprising the JAD Division (the "JAD Entities") are subject to two sets of intercreditor agreements, setting forth the priority among the different creditors:

- First Amended and Restated Intercreditor and Subordination Agreement, dated September 30, 2009, among JAD, Sandlick, Fox Knob, Aubra Paul Dean, Carl E. McAfee, Julia McAfee, and CAMOFI Master LDC ("CAMOFI"), as agent for certain lenders, ECM I and WTC as collateral agent ("Prior Asset Intercreditor Agreement"); and

- Intercreditor and Subordination Agreement (Assets), dated December 7, 2011, among JAD, Sandlick, Fox Knob, ECM II, the JAD Sellers, Dean McAfee Holdings, LLC, ECM I, and Wilmington Trust Company ("WTC") as collateral agent under the ECM I Credit Agreement and the ECM II Credit Agreement ("2011 Asset Intercreditor Agreement").

62.    Additionally, the stock/membership interests of the JAD Entities are subject to two sets of intercreditor agreements, setting forth the priority among the different creditors:

- The Intercreditor and Subordination Agreement, dated April 15, 2008, among U.S. Coal, the JAD Sellers, CAMOFI, as agent for certain lenders, ECM I, as successor to JMB Capital Partners Master Fund, L.P., and Merrill Lynch Commodities, Inc. ("Prior Stock Intercreditor Agreement"); and

- Intercreditor and Subordination Agreement (Stock), dated December 7, 2011, among the Company, the JAD Sellers, ECM II, ECM I and WTC as collateral agent under the ECM I Credit Agreement and the ECM II Credit Agreement ("2011 Stock Intercreditor Agreement" and collectively with the Prior Asset Intercreditor Agreement, Prior Stock Intercreditor Agreement, and the 2011 Intercreditor Agreement, the "JAD Intercreditor Agreements").

15013559.2

63.     The JAD Intercreditor Agreements divide the assets of the JAD Entities in existence as of April 15, 2008 (the "JAD Acquisition Date") into the following categories (which correspond to the defined terms used in the JAD Intercreditor Agreements and are collectively defined as the "JAD Collateral"):

- Existing Lender Collateral (i.e., all equipment and interests in real property owned by the JAD Entities on the JAD Acquisition Date subject to the liens of First Tennessee National Bank, CIT Financial, Powell Valley National Bank, and their assigns (collectively, the "Existing Lenders")  and on which the JAD Sellers were granted a second lien security interest);

- Unencumbered Collateral (i.e., all equipment, fixtures and other personal property and coal reserves owned on the by the JAD Entities on the JAD Acquisition Date not subject to a security interest of any third party and on which the JAD Sellers were granted a first lien security interest); and

- Other Collateral (i.e., the right to receive a first lien security interest in the Existing Lender Collateral after repayment in full of debt held by Existing Lenders other than First Tennessee National Bank).

The respective categories are further subdivided into the following categories of collateral (which correspond to the defined terms used in the Prior Asset Intercreditor Agreement):

- Encumbered Centrecourt  Collateral (i.e., the portion of the Existing Lender Collateral in which CAMOFI has a security interest;

- Unencumbered Centrecourt  Collateral (i.e., the portion of the Unencumbered Collateral and Other Collateral in which CAMOFI has a security interest);

- Encumbered ECM Collateral (i.e., all Existing Lender Collateral other than Encumbered Centrecourt  Collateral); and

- Unencumbered ECM Collateral (i.e., all Unencumbered Collateral and all Other Collateral other than Unencumbered Centrecourt Collateral).

64.     The respective priorities of each of the lenders can be summarized as follows:

| Existing Lender Collateral | Encumbered Centrecourt Collateral | 1. Existing Lenders<br>2. JAD Sellers<br>WTC as collateral agent for ECM I and ECM II |
|---|---|---|

| Existing Lender Collateral | Encumbered ECM Collateral | 1. Existing Lenders 2. JAD Sellers WTC as collateral agent for ECM I and ECM II |
|---|---|---|
| Unencumbered Collateral; Other Collateral | Unencumbered Centrecourt Collateral | 1. JAD Sellers 2. WTC as collateral agent for ECM I and ECM II |
| | Unencumbered ECM Collateral | 1. JAD Sellers 2. WTC as collateral agent for ECM I and ECM II |
| JAD Wash Plant | 1. JAD Sellers 2. WTC as collateral agent for ECM I and ECM II | |

65.     In addition to the security interests described above, WTC, as collateral agent for ECM I and ECM II, has a security interest in substantially all of the assets of the JAD Entities that are not otherwise part of the JAD Collateral.

66.     Under the 2011 Stock Intercreditor Agreement, the priority of the lenders as to their respective security interests in the stock/membership interests of the JAD Entities are: first, JAD Sellers and Dean McAfee Holdings, LLC, WTC as collateral agent for ECM I, and third, WTC as collateral agent for ECM II.

**(ii)    Unsecured Debt**

67.     As of the Relief Date, the Debtors also owe approximately $28.6 million in unsecured obligations to various trade creditors, lease counterparties, and unsecured lender parties as will be described in more detail in the Debtors' Schedules and Statements of Financial Affairs to be filed in these cases.

## II.

## Events Leading to Chapter 11 Cases

68.     Although these cases were precipitated by the filing of the Involuntary Petitions, it has become clear that the Debtors' businesses have become unsustainable without the benefits derived from reorganization under the Bankruptcy Code.  The Debtors' capital structure cannot be sustained particularly when confronted with declining operating performance in a highly competitive and highly regulated industry.

### A.     Decline in Coal Industry Profitability

69.     In the past three years, despite the Debtors' efforts at implementing various operational initiatives to improve margins, the domestic demand for coal has decreased dramatically, in large part because alternative sources of energy have become increasingly attractive to electricity generators in light of declining natural gas prices.  Also, the Debtors face sharply rising costs due to the regulatory environment in which they operate.

70.     Because the Debtors sell substantial quantities of coal products to domestic electricity generators, the Debtors' businesses and results of operations are linked closely to domestic demand for coal-fueled electricity.  As the domestic electricity markets increasingly turn to natural gas and renewable fuels, and with the softening of the global steel markets, demand has dropped for thermal coal.  The coal industry is competitive both within the industry and with respect to alternative fuel sources. The most important factors on which the Debtors compete are price, coal quality and characteristics, transportation costs from the mine to the customer, and reliability of supply. The domestic coal markets are increasingly consolidating. The economic and regulatory environments of the past five years have accelerated the need for structural changes in the U.S. coal industry.

71.     Over the last several years, coal's share of the U.S. energy market and prices for thermal coal have both markedly declined.  Coal's share of total generation, for example, declined from 50% in 2012 to 39% in 2013.  Vast resources of natural gas have been unlocked through the new discovery of shale deposits and technological advancements in drilling, causing the price of natural gas in the United States to fall.  Natural gas prices are well below historical averages and, as a result, the coal industry as a whole has been forced to reduce production, idle mines, and lay off workers.  Despite a significant decrease in natural gas in underground storage over the preceding harsh winter, neither natural gas prices nor coal prices have seen measurable increases.

### B.      Debtors' Burdensome Capital Structure

72.     As discussed below, the Debtors operate in a highly regulated, highly competitive industry.  While these external regulatory and industry forces present significant challenges to the Debtors, the Debtors are also struggling to deal with a burdensome capital structure.

73.     The Debtors have an unsustainable level of debt.  The Debtors' capital structure needs to be right sized for the Debtors to have a legitimate chance of coming out the other side of these bankruptcy cases.  In addition to the high level of debt, the Debtors' are burdened with debt covenants and terms indicative of a high degree of investor negotiating strength as evidenced in the Management Rights enjoyed by CAM and the convertible preferred equity with equity "kickers" (options and warrants on common equity given to enhance the attractiveness of the offer) and the management rights that offer superior control to specific equity classes.  These concessions have restricted the Debtors' ability to raise equity, sell the company, merge the company with strategic partners, or make any significant capital decisions.

15013559.2

74.     Moreover, as the Debtors' assets have become fully encumbered, including without limitation, their accounts receivable, the Debtors have not been able to obtain a new revolving line of credit to finance working capital needs.  When faced with a sudden need to repay the line of credit, the Debtors were prevented from making regularly scheduled payments to their vendors, which harmed operations by restricting the Debtors' ability to obtain goods and services on normal business terms and served to damage relations with many vendors.

75.     Based on their capital structure, the Debtors have been forced to direct large sums of money to repayment of their lenders at high interest rates, rather than using those funds to reinvest in the business.  During 2012, for example, the Debtors and their related entities made $8.9 million of principal repayments and $6.4 million of interest payments (excluding capital leases) related to $52 million of notes payable as of December 31, 2012.   The Debtors during 2012 made $15.3 million in payments to note holders while spending only $9.4 million on net capital expenditures in the same time period.

76.     Additionally, the Debtors and their related non-debtor entities have consistently issued and refinanced debt instruments, which has resulted in enhanced security interests to their lenders.  The burdensome secured debt encumbering all existing assets has further prevented the Debtors from funding their working capital needs efficiently.   The lack of a working capital facility coupled with abnormally tight credit terms with vendors has resulted in a liquidity crisis.

77.     Finally, because of the complexity of the Debtors' capital structure and the related debt instruments issued, the Debtors directly and indirectly have found themselves locked in litigation with multiple parties with the attendant responsibility to pay millions of dollars in professional fees not only for themselves, but for their officers, directors, and certain lenders.

15013559.2

The litigation has also diverted the attention of management away from the pressing business and financial issues confronting the Debtors at a time of crisis for the Debtors.

### C.     Governmental Regulations and Costs of Compliance

78.     In addition to the troubling financial condition of the Debtors described above, the regulatory environment, both with respect to customers who purchase coal and the operations of coal mining companies, has contributed to the Debtors' current financial situation.  Specifically, the regulation of electricity generators has made it increasingly difficult for companies to use coal as an energy source and may lead to a further reduction in the amount of coal consumed by the electricity generation industry.  As the current regulatory environment effects demand, the Debtors must be conscious of managing the cost of production both from a general operation perspective and as those cost relate to compliance with environmental laws and other governmental regulations.

### (i)     Regulation of Power Plants

79.     As the regulation of greenhouse gases and other air emissions imposed on power plants has become more rigorous, electricity generators are facing increasing difficulties in obtaining permits to build and operate coal-fired power plants and higher costs to comply with the permits received at existing facilities.  Several regulations promulgated by the United States Environmental Protection Agency (the "EPA") under the Clean Air Act have been enacted to regulate emissions of sulfur dioxide, nitrogen oxide, mercury, and other air pollutants from power plants and industrial boilers.  The regulations include the Clean Air Interstate Rule ("CAIR"), the Mercury and Air Toxics Standards, and National Emission Standards for Hazardous Air Pollutants for Industrial/Commercial/Institutional Boilers.  The implementation of these rules over the next several years threatens to place significant financial and operational

burdens on or close all coal-fueled electricity generation units that are not equipped with the appropriate pollution control equipment, which could reduce the Debtors' customers' demand for coal.  CAIR might be replaced by another rule regulating sulfur dioxide and nitrogen oxides known as the Cross-State Air Pollution Rule ("CSAPR"), which could similarly impose significant obligations on the Debtors' customers, which could likewise reduce the demand for coal.

80.    Recent announcements of additional initiatives intended to reduce greenhouse gas emissions globally, including curtailing United States government support for public financing of new coal-fired power plants overseas and promoting fuel switching from coal to natural gas or renewable energy sources impose further threats to the coal industry. The EPA is expected to establish emissions standards for carbon dioxide ("$CO_2$") for large, newly constructed fossil-fueled power plants, which would require the implementation of costly pollution control technology.  Such initiatives will likely place significant financial and operational burdens on the Debtors' customers, leading to a reduction in the amount of coal they purchase from the Debtors, which could adversely affect the Debtors' results of operations.

81.    Electricity generators are also being incentivized to use alternative energy sources.  Many states have implemented renewable portfolio standards, which generally mandate that a specified percentage of electricity sales in the state be attributable to renewable energy sources. Congress has considered imposing a similar federal mandate. Governmental agencies have also been providing grants and other financial incentives to entities that are developing or selling alternative energy sources with lower greenhouse gas emissions.  The combination of these incentives and the cost of complying with regulations may cause electricity generators to close existing coal-fueled facilities, reduce construction of new facilities or further switch the

fuel used at existing facilities from coal to alternative fuels like natural gas or renewable fuels. Moreover, as the majority of the Debtors' coal supply agreements contain provisions that permit a purchaser to terminate its contracts if certain unfavorable legislation is passed, further regulation of greenhouse gases may impact the Debtors' existing contractual relationships.

(ii)        <b>Regulation of Coal Mining</b>

82.     Federal and state regulatory authorities impose obligations on the coal mining industry in many areas, including employee health and safety, permitting and licensing requirements, environmental protection, the reclamation and restoration of mining properties after mining has been completed, surface subsidence from underground mining and the effect of mining on surface and groundwater quality and water availability.  Over the past several years, new regulations and new interpretations of existing laws and regulations have also stressed the Debtors' financial condition.

83.     The Debtors expect to continue to incur significant costs in order to maintain ongoing compliance with these and other health and safety requirements, including with respect to stringent dust exposure standards and automated safety measures for continuous mining machines.  In addition, regulatory agencies and environmental groups have been increasingly focused on the effects of surface coal mining on the environment. The increased regulatory scrutiny has resulted in more rigorous permitting requirements and enforcement efforts. As a result, the Debtors have experienced dramatic increases in the cost, time, and effort necessary to obtain and comply with critical mine permits, as well as the cost to mitigate the environmental effects of their operations. The Debtors estimate that they may have to spend millions of dollars over the next several years to comply with their environmental obligations, including for reclamation and restoration of closed mines.

24

## III.

## First Day Motions

### A.    Administrative Motions

i.    *Debtors' Expedited Motion for an Order Granting Expedited Hearing on Certain First Day Motions and Approving Shortened and Limited Notice Thereof (the "Expedited Hearing Motion").*

84.    The Debtors seek entry of an order on an expedited basis for a hearing on their various first day motions and applications on limited notice and approving the Debtors' proposed form and manner of the notice of the Relief Date for these Chapter 11 cases.

85.    Given that these case were commenced by the filing of the Involuntary Petitions, and the Debtors are in immediate need of the relief they are seeking by their first day pleadings, I believe that the relief requested in the Expedited Hearing Motion is critical to these cases, provides adequate notice of these cases to the Debtors' creditors and all other parties in interest, and is critical to achieving a successful and smooth transition to a voluntary Chapter 11 process. Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Hearing Motion should be granted.

ii.    *Debtors' Expedited Motion for First Day Motions and All Subsequent Motions to be Heard in Lexington Division (the "Hearings in Lexington Motion")*

86.    In the Hearings in Lexington Motion, the Debtors seek entry of orders allowing the First Day Motions and all subsequent motions in these Chapter 11 cases to be heard in the Lexington Division of the United States Bankruptcy Court for the Eastern District of Kentucky, rather than the Ashland Division.  Holding hearings in these cases to be held in the Lexington Division will allow the Debtors to save on professional fees.  The Debtors' proposed general local counsel is located in Lexington, Kentucky, and is able to attend hearings in the Lexington Division without causing the Debtors' estates to incur travel expenses.  The Debtors' proposed

15013559.2

general counsel is located in New York, New York, and would incur significantly less travel expenses by attending hearings in the Lexington Division, rather than in the Ashland Division, due to the proximity of regional airports.

87.    It is likely that a number of the Debtors' creditors and other parties in interest have or will retain counsel in Lexington, and the Debtors do not believe that holding hearings in these bankruptcy cases in the Lexington Division would inconvenience a majority of creditors any more than it would to hold hearings in the Ashland Division.  Accordingly, on behalf of the Debtors, I respectfully submit that the Hearings in Lexington Motion should be granted.

iii.    *Debtors' Expedited Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "Expedited Case Management Motion")*

88.    The Debtors seek entry of an order on an expedited basis to implement certain procedures in connection with the administration of the Chapter 11 cases, including an order: (i) approving the establishment of a master service list and notice procedures; (ii) scheduling pre-set monthly omnibus hearing dates; and (iii) establishing procedures governing the timing of stay relief motions in connection with the administration of these Chapter 11 cases, all as more specifically set forth in the Expedited Case Management Motion.  The Debtors believe that the requested relief will maximize the efficiency and orderliness of the administration of these Chapter 11 cases and reduce the costs associated with traditional case management procedures. The Debtors also believe that granting the relief requested will limit the administrative burdens and costs associated with preparing for hearings and serving and mailing documents. In addition, the relief requested will assist the Debtors and their personnel and professionals in organizing and prioritizing the numerous tasks attendant to these cases.

15013559.2

89.     Given that these cases were commenced by the filing of the Involuntary Petitions, I believe that the relief requested in the Expedited Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Case Management Motion should be granted.

#### iv.  *Debtors' Expedited Motion for an Order Directing Joint Administration of Chapter 11 Cases (the "Expedited Joint Administration Motion")*

90.     The Debtors seek entry of an order on an expedited basis directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 cases under the lead case, Licking River Resources, Inc.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 cases of the Debtors to indicate the joint administration of the estates.

91.     U.S. Coal is the sole shareholder or sole member, as applicable, of each of the Debtors.  Therefore, the Debtors are affiliates as that term is defined in 11 U.S.C. § 101(2) and used in Fed. R. Bankr. P. 1015(b).

92.     Joint administration of the Debtors' Chapter 11 cases is appropriate because the Debtors intend to file with this Court numerous pleadings and applications that they believe will affect each of the Debtors' cases equally, and joint administration will reduce the amount of duplicative pleadings and notice that will be filed and/or served.  Additionally, it is anticipated that one overall plan for reorganization will be proposed.  As such, the joint administration of these cases will promote the economical, efficient, and convenient administration of the Debtors' Estates.

27

93.     Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted.  Joint administration will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors considerable expense and resources. The Debtors' financial affairs and business operations are closely related. Many of the motions, hearings and orders in these Chapter 11 cases will affect each Debtor and their respective estates.  The rights of creditors will not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates.

94.     Moreover, each creditor can still file its claim against a particular estate. In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these Chapter 11 cases. The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative tiles. Finally, supervision of the administrative aspects of these Chapter 11 cases by the United States Trustee for the Eastern District of Kentucky will be simplified.

95.     I believe that the relief requested in the Expedited Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Joint Administration Motion should be granted.

v.   *Debtors' Expedited Motion for an Order Authorizing Extension of Time to File Schedules (the "Expedited Extension of Schedules Motion")*

96.     The Debtors seek entry of an order on an expedited basis granting additional time to file their schedules and statements of financial affairs.  Due to the complexity of their operations, the large number of contracts to which the Debtors are party and the numerous other

28

matters that the Debtors must attend to in connection with filing these cases, the Debtors will likely not be able to complete the schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and statements of financial affairs in the fourteen days provided under Bankruptcy Rule 1007(c).

97.    Given the many critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 cases, I believe that with the extension requested, the Debtors will be able to focus their attention to business operations to maximize the value of the Debtors' estates during the first critical post-petition months. I believe this will help the Debtors make a smooth transition into Chapter 11 and, therefore, maximize the value of the Debtors' estates to the benefit of creditors and all parties in interest.

98.    I believe that the relief requested in the Expedited Extension of Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Extension of Schedules Motion should be granted.

vi.    *Debtors' Expedited Motion for Interim and Final Approval of Debtors' Application to Employ Nixon Peabody LLP as their Counsel as of the Relief Date (the "Nixon Application")*

99.    Concurrently herewith, the Debtors filed applications to retain Nixon Peabody LLP ("Nixon") as their general counsel in these bankruptcy cases.  I believe the retention of Nixon is critical because of their experience and extensive knowledge in the practice of bankruptcy law and their familiarity with the Debtors' operations and background.

100.    I believe that the relief requested in the Nixon Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical

element in achieving a successful prosecution of these Chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully request that the Nixon Application should be granted.

vii.    *Motions to Admit (i) Dennis M. Drebsky; (ii) Christopher M. Desiderio; and (iii) Lee Harrington, Pro Hac Vice (the "Pro Hac Motions")*

101.    The Debtors have filed a series of Motions for Admission *Pro Hac Vice* for their lead bankruptcy counsel, Dennis M. Drebsky, Christopher M. Desiderio, and Lee Harrington, of the law firm Nixon Peabody, LLP.  As set forth in the *Pro Hac* Motions, each of these attorneys are members in good standing of the various state bars to which each is admitted.  Each possesses significant bankruptcy experience and their services are essential to the successful prosecution of the Debtors' bankruptcy cases.

102.    I believe that the relief requested in the *Pro Hac* Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the *Pro Hac* Motions should be granted.

viii.    *Debtors' Expedited Motion for Interim and Final Approval of the Debtors' Application to Employ DelCotto Law Group PLLC as their General Local Counsel Effective as of the Relief Date  (the "DelCotto Application")*

103.    Concurrently herewith, the Debtors filed applications to retain the DelCotto Law Group PLLC ("DelCotto") as their general local counsel.  I believe the retention of DelCotto is critical because of their experience and expertise in the practice of bankruptcy law and their familiarity with the Debtors and with the requirements of local practice before this Court.

104.    I believe that the relief requested in the DelCotto Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful prosecution of these Chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully request that the DelCotto Application should be granted.

30

ix.    *Debtors' Motion to Employ and Retain GlassRatner Advisory & Capital Group as Financial Advisor to the Debtors (the "<u>Glass Ratner Motion</u>")*

105.    Concurrently herewith, the Debtors filed a motion to employ and retain GlassRatner Advisory & Capital Group ("<u>Glass Ratner</u>") as their financial advisors. I believe the retention of Glass Ratner is critical because of their experience and expertise in providing financial advisory services to debtors in bankruptcy law and their familiarity with the Debtors operations gained through services provided prior to the Relief Date.

106.    I believe that the relief requested in the Glass Ratner Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful prosecution of these Chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully request that the Glass Ratner Motion should be granted.

x.    *Debtors' Application for an Order Authorizing and Approving the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Claims, Noticing, and Balloting Agent for the Debtors and Debtors in Possession Effective as of the Relief Date (the "<u>Claims, Noticing, and Balloting Agent Application</u>")*

107.    Concurrently herewith, the Debtors filed applications to retain Epiq Bankruptcy Solutions, LLC ("<u>Epiq</u>") as their claims, noticing, and balloting agent. I believe the retention of Equip is critical because of the large number of creditors identified in this case and in order to comply with the notice requirements set forth in the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules.

108.    I understand that Epiq is a data processing firm with extensive experience in noticing, claims processing, balloting, and other administrative tasks in Chapter 11 cases. Given the need for the services described above and Epiq's expertise in providing such services, I believe that retaining Epiq will expedite service of notices, streamline the claims administration

and balloting processes, reduce the administrative costs associated with such tasks, and permit the Debtors to focus on mining and reorganization efforts.

109.     Accordingly, on behalf of the Debtors, I respectfully submit that the Claims, Noticing, and Balloting Agent Application should be granted.

### B.     Operational Motions Seeking Immediate Relief

 i.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. §363; (II) Granting Adequate Protection to Pre-Petition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, and 364; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) (the "Cash Collateral Motion")*

110.     The Debtors have virtually no free and available cash to fund their ongoing operations. The Debtors urgently need to use Cash Collateral to obtain new credit to purchase inventor, pay their employees, and continue their operations. Without the immediate availability of cash collateral, the Debtors' operations would be severely disrupted and they would be forced to cease or sharply curtail their operations and eliminate their ability to generate revenue. The Debtors believe that the proposed use of cash collateral will address the Debtors' immediate working capital and liquidity needs. In addition to providing much needed liquidity, the ability to use cash collateral to fund operations will provide a sense of confidence in the Debtors' suppliers and employees. Without immediate access to cash collateral, the Debtors face a crisis that would threaten the viability of the bankruptcy cases, and would likely result in the closure of the mines.

111.     For the forgoing reasons, the use of cash collateral is warranted.

 ii.     *Motion for Interim and Final Orders:  (I) Authorizing, But Not Requiring, Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation and (B) Maintain Benefits Programs; and (II) Authorizing and Directing Banks to Honor All Related Checks and Electronic Payment Requests (the "Wages and Benefits Motion")*

112.    In the Wages and Benefits Motion, the Debtors seek entry of an order (a) authorizing, but not requiring, them to pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Wages, the Withholding Obligations, the Reimbursement Obligations, the Health and Welfare Plan Obligations, the Vacation and Sick Leave Obligations, the 401k Plan, the Savings Plans, the Severance Obligations, the Contingent Workers Obligations, the Bonus Plan Obligations, the Allowance Programs, and the Other Employee Programs; (b) unless otherwise set forth in the Wages and Benefits Motion, authorizing, but not requiring, them to continue, in their sole discretion, their plans, practices, programs, and policies for their current and former Employees, as applicable, as those Employee Programs were in effect as of the Petition Date and as may be modified, terminated, amended, or supplemented from time to time, in their sole discretion, and to make payments pursuant to the Employee Programs in the ordinary course of business, as well as to pay related administrative obligations; (c) authorizing applicable banks and other financial institutions to receive, process, and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing (all capitalized terms as defined in the Wages and Benefits Motion).

113.    If the requested relief is not granted, the Debtors' relationships with their employees would be adversely impacted and there could well be irreparable harm to the employees' morale, dedication, confidence, and cooperation. The Debtors' businesses hinge on their relationships with their customers, and the ability to provide superior services is vital. The employees' support for the Debtors' efforts is critical to the success of these Chapter 11 cases. At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that

15013559.2

would inevitably attend any decline in their Employees' morale attributable to the Debtors' failure to pay wages, salaries, benefits, and other similar items.

114.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be granted.

> *iii. Motion for Interim and Final Orders:  (I) Authorizing Debtors to (A) Continue Workers Compensation Program and Liability, Product, Property, and Other Insurance Programs and (B) Pay All Obligations in Respect Thereof, and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Insurance Motion")*

115.    In the Insurance Motion, the Debtors seek entry of an order authorizing (a) the Debtors to maintain, continue and renew, in their sole discretion, the Insurance Programs on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Relief Date, and (b) and financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing (all capitalized terms as defined in the Insurance Motion). This would include (i) paying all amounts arising under the Insurance Programs or the financing thereof, and (ii) renewing or obtaining new insurance policies as needed in the ordinary course of business.

116.    The Debtors maintain various liability, casualty, property, and other insurance and reinsurance and risk control programs through several private insurance carriers in the ordinary course of the Debtors' businesses. If the requested relief is not granted and the Insurance Programs lapse or terminate, the Debtors may well be unable to continue large portions of their operations, thereby endangering the value of the Debtors' assets and substantially harming all creditors. The Debtors believe that all material amounts related to the Insurance Programs that

were due and payable on or prior to the Relief Date have been fully paid but, out of an abundance of caution and to avoid irreparable harm to their businesses, the Debtors seek authority to satisfy any such prepetition obligations through the Insurance Motion.

117.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, respectfully submit that the Insurance Motion should be granted.

       *iv.*    *Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Prepetition Critical Vendor Claims and (II) Financial Institutions to Honor and Process Related Checks and Transfers (the "Critical Vendor Motion")*

118.    In the Critical Vendor Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not requiring, the Debtors, in their sole discretion, to pay all or a portion of certain prepetition invoices from critical vendors who provide services that the Debtors determine, in their sole discretion, to be absolutely necessary to the Debtors' operations going forward.

119.    The services provided by the Critical Vendors are essential to the Debtors' day-to-day operations.

120.    I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful reorganization.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendor Motion should be granted.

       *v.*    *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Royalty Obligations (the "Royalty Motion")*

121.    In the ordinary course of their operations, Debtors entered into a series of ground leases with approximately 200 landowners (the "Royalty Recipients") to perform mining

operations on their land.   As consideration for such leases, Debtors have agreed to pay each Royalty Recipient a percentage of the value of coal mined on his or her property (the "Royalty Payments").

122.    It is essential to the Debtors' operations that they be permitted to pay these accrued but unpaid royalty payments.   Without the payments, the Debtors would be unable to continue their operations and the result would likely be closure of the mines.

123.    I believe that the relief requested in the Royalty Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.   Accordingly, on behalf of the Debtors, I respectfully submit that the Royalty Motion should be granted.

   *vi.*  *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Continue and Renew Surety Bond Program (the "Surety Motion")*

124.    In the Surety Motion, the Debtors seek entry of interim and final orders authorizing (a) the Debtors to maintain, continue and renew, in their sole discretion, their Surety Bond Program (as defined in the Surety Motion) on an uninterrupted basis and in accordance with the same practices and procedures, including, but not limited to, the maintenance of cash collateral, as was in effect before the Petition Date, and (b) their financial institutions to receive, process, honor, and pay related checks or wire transfers.   This authority would include permitting the Debtors (i) to pay all amounts arising under the Surety Bond Program due and payable before or after the Petition Date, and (ii) to renew or obtain new surety bonds as needed, including, but not limited to, as may be required by law or judicial authority, without further notice or order of the Court.

125.    I believe that the relief requested in the Surety Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical

15013559.2

element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf

of the Debtors, I respectfully submit that the Surety Motion should be granted.

> vii.    *Debtors' Motion for Entry of an Order Authorizing (i) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "Cash Management Motion")*

126.    In the Cash Management Motion, the Debtors seek entry of an order (a)

authorizing, but not directing them, to (i) continue to operate their prepetition cash management

system with respect to intercompany cash management and obligations, (ii) fund the operations

of subsidiaries, (iii) maintain the Debtors' existing bank accounts, and (iv) maintain the Debtors'

existing business forms.  Without the requested relief, the Debtors would have great difficulty

maintaining their operations, which could cause grievous harm to the Debtors and their estates.

127.    I believe that the relief requested in the Cash Management Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

> viii.    *Debtors Motion for Interim and Final Order Authorizing Payment of Certain Prepetition Taxes (the "Tax Motion")*

128.    By the Tax Motion, the Debtors seek entry of an order authorizing, but not

directing the Debtors to pay (i) Production Taxes, (ii) Coal Excise Taxes, (iii) Environmental and

Safety Fees and Assessments, (iv) Use Taxes, (v) Franchise Taxes and Fees, (vi) Unmined

Minerals Taxes and other Property Taxes, and (vii) Other Taxes (collectively, the "Taxes").

129.    Many of the Taxes collected prepetition are not property of the Debtors' estates

and must for that reason be turned over to the Governmental Authorities. To the extent that they

are not actually the property of the Governmental Authorities, they may well give rise to priority

claims. Moreover, the Debtors also seek to pay Taxes order to forestall the Governmental Authorities from taking actions that might interfere with the Debtors' businesses, such as blocking the receipt or renewal of permits required for the Debtors' continued operations or possibly bringing personal liability actions against directors, officers, and other employees in connection with non-payment of the Taxes.

130.    I believe that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Tax Motion should be granted.

ix.    *Debtors' Expedited Motion for an Order Regarding Adequate Assurance of Payment for Utility Services (the "Utilities Motion")*

131.    In the Utilities Motion, the Debtors seek entry of an order (a) determining that the Debtors' proposed offer of deposits provides the Utility Providers listed in the Motion with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code, (b) approving procedures for resolving requests by Utility Providers for additional or different assurances beyond those set forth in the Motion, and (c) prohibiting the Utility Providers from altering, refusing or discontinuing any utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

132.    The Debtors currently utilize electric, cable, internet, telephone, waste removal, and water utility services in their operations provided by certain Utility Providers as described in greater detail in the Utilities Motion.

133.    Because the Utility Providers provide essential services, any interruption in such services would prove devastating to the Debtors' ability to continue their operations.  The

15013559.2

temporary or permanent discontinuation of utility services at the Debtors' offices, mines, and related operations would severely restrict the Debtors' ability to continue operating and could cause irreparable harm.   Uninterrupted utility services are essential to the Debtors' ongoing operations.

134.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.   Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

135.    I, the undersigned Chief Executive Officer and director for each of the above-referenced Debtors, declare under penalty of perjury that the foregoing is true and correct.


Dated: June 9, 2014                          /s/ John Collins
                                             John Collins
                                             Chief Executive Officer,
                                             Licking River Resources, Inc.
                                             Licking River Mining, LLC
                                             S.M. & J. Inc.
                                             Fox Knob Coal Co., Inc.
                                             J.A.D. Coal Company, Inc.

SCHEDULE A

15013559.2