UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY

IN RE:

| | |
|---|---|
| LICKING RIVER MINING, LLC | CASE NO. 14-10201 |
| LICKING RIVER RESOURCES, INC. | CASE NO. 14-10203 |
| S. M. & J., INC. | CASE NO. 14-10220 |
| | (ASHLAND DIVISION) |
| | |
| FOX KNOB COAL CO., INC. | CASE NO. 14-60619 |
| J.A.D. COAL COMPANY, INC. | CASE NO. 14-60676 |
| | (LONDON DIVISION) |
| | |
| ALLEGED DEBTORS | CHAPTER 11 |
| | |
| | (JOINT ADMINISTRATION |
| | APPLICATION PENDING) |

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3),
364(d)(1), 364(e) AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I)
AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF
THE BANKRUPTCY CODE, (II) GRANTING LIENS AND SUPER-PRIORITY
CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES AND (IV) SCHEDULING A FINAL
HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

Comes Licking River Mining, LLC ("LR Mining"), Licking River Resources, Inc.

("LRR"), S. M. & J., Inc. ("SM&J"), Fox Knob Coal Co., Inc. ("Fox Knob"), and J.A.D. Coal

Company, Inc. ("JAD"), as alleged debtors (collectively, the "Debtors"), by counsel, pursuant to

Sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of

title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy

Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and the Local Bankruptcy Rules for the Eastern District of Kentucky,

including Rule 4001-2 and 4001-4 (the "Local Rules"), hereby move (the "Motion") for entry of

interim (the "Interim Order") and final orders: (1) authorizing the Debtors' use of cash collateral

15011334.2

("<u>Cash Collateral</u>") and all other collateral; (3) granting senior liens and superpriority administrative expense claims; and (3) providing the adequate protection described herein to certain of the lenders and issuers of letters of credit (the "<u>Pre-Petition Lenders</u>").

<u>**JURISDICTION AND VENUE**</u>

1.      On May 22, 2014 (the "<u>LR Mining Commencement Date</u>"), an involuntary petition seeking relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>") was filed against LR Mining.  On May 23, 2014 (the "<u>LRR/Fox Knob Commencement Date</u>"), involuntary petitions seeking relief under Chapter 11 of the Bankruptcy Code were filed against LRR and Fox Knob.  On June 3, 2014 (the "<u>SM&J Commencement Date</u>"), an involuntary petition seeking relief under Chapter 11 of the Bankruptcy Code was filed against SM&J.   On June 4, 2014 (the "<u>JAD Commencement Date</u>," and together with the LR Mining, LRR/Fox Knob, and SM&J Commencement Dates, the "<u>Commencement Dates</u>"), an involuntary petition seeking relief under Chapter 11 of the Bankruptcy Code was filed against JAD.  The foregoing involuntary petitions are collectively referred to as the "<u>Involuntary Petitions</u>."

2.      In response to the Involuntary Petitions, on June 9, 2014, the Debtors acknowledged that they did not have a defense to allegations contained by filing their Consolidated Answer and Consent to Entry of Order for Relief and Reservation of Rights (the "Answer").   The Debtors anticipate that the Court will enter an order for relief in these bankruptcy cases in the near future, and the date that the order for relief is entered is hereinafter referred to as the "Relief Date."  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 cases pursuant to Fed. R. Bankr. P. 1015(b).

4.      This Court has jurisdiction over these Chapter 11 cases under 28 U.S.C. §§ 157 and 1334.  This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A).

5.      The Debtors maintain their principal places of business in Fayette County, Kentucky.  Accordingly, venue for the Debtors' Chapter 11 cases is proper in this District under 28 U.S.C. §§ 1408 and 1409.

6.      No trustee or examiner has been appointed in these Chapter 11 cases, and no creditors' committee or other official committee has been appointed.\

## BACKGROUND

### The Debtors' Business

7.      U.S. Coal Corporation ("U.S. Coal"), the non-debtor parent of each of the Debtors, was formed in 2006 for the purpose acquiring and consolidating several smaller coal operations and taking advantage of perceived arbitrage opportunities between private and public market valuations through an anticipated initial public offering.

8.      U.S. Coal operates through two divisions (previously independently owned and operated).  In January 2007, U.S. Coal acquired LRR, LR Mining, SM&J, and Oak Hill Coal, Inc. (a non-debtor).  These entities, collectively, are commonly referred to as the "Licking River Division." LRR, LR Mining and SM&J are collectively referred to as the "Licking River Debtors."

9.      In April 2008, U.S. Coal acquired JAD, Fox Knob, and Sandlick Coal Company, LLC (a non-debtor).   These entities, collectively, are commonly referred to as the "JAD Division." JAD and Fox Knob are collectively referred to as the "JAD Debtors"

10.     U.S. Coal is located in the central Appalachia region of eastern Kentucky. Between the two divisions, U.S. Coal controls approximately 80,000 acres, the majority of which is leased.  LRR has approximately 26.3 million tons of surface reserves under lease, and JAD has approximately 24.4 million tons of surface reserves comprised of both leased and owned real property.  At present, U.S. Coal has three surface mines in operation between its two divisions and associated highwall miner operations at each location.

11.     As of May 1, 2014, U.S. Coal had approximately $75.0 million of liabilities (excluding asset retirement and capital lease obligations).  Of this $75.0 million, approximately $46.4 million was comprised of secured debt, including secured equipment financing, certain put right holders (whose claims are disputed), and Pyror Cashman LLP.  The balance of approximately $28.6 million is comprised of obligations to trade creditors and holders of certain unsecured notes.

12.     In an effort to reduce costs of production, increase operational efficiencies, and increase revenues, U.S. Coal undertook a number of operational initiatives over the past several years.  The efforts included the closing of smaller operations and the termination of 70 employees.  U.S. Coal also made company-wide salary and benefits reductions including a ten percent reduction in wages for hourly personnel and a fifteen percent reduction in wages for salaried employees, while increasing U.S. Coal's required contribution for health benefits by employees by twenty percent.  In addition to other initiatives, U.S. Coal also:  (i) renegotiated lease rates with its mineral rights owners; (ii) renegotiated service contracts and terms with vendors; (iii) reduced their debt service requirements (both of principal amortization and interest obligations) by refinancing equipment notes; (iv) renegotiated their plant operation and maintenance agreements; and (v) undertook certain company-wide pricing initiatives in 2014.

13.     Immediately prior to the Commencement Dates, the Debtors faced severe liquidity restrictions and had a general inability to readily access a line of credit. In addition, unfavorable coal production in the fourth quarter of 2013 and first quarter of 2014 severely hampered the Debtors' profitability.  As a result, immediately prior to the Commencement Dates, the Debtors were unable to satisfy their debts to vendors as they became due in the ordinary course of business. Vendors responded to the Debtors' inability to pay their debts by restricting their credit terms to the Debtors and ultimately commencing these Chapter 11 cases.[1]

14.     Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of John Collins, the Debtors' Chief Executive Officer filed herein, which is incorporated herein by reference.

### The Debtors' Pre-Petition Secured Debt

15.     The structure of the Debtors' pre-Petition secured debt is complex.

16.     On December 7, 2011, in addition to incurring new debt, U.S. Coal and its subsidiaries paid off, refinanced or restructured certain non-equipment financing debt (the "2011 Refinancing").

### JAD Sellers

17.     Aubra Paul Dean, Carl E. McAfee, Julia McAfee (the "JAD Sellers") received a portion of the purchase price for the sale of the JAD Division to U.S. Coal in the form of notes, which were subsequently amended and restated as part of the 2011 Refinancing:

---

[1]     The Certificates of Designation of U.S. Coal's Series A and Series B Convertible Preferred Stock purport to require the consent of a supermajority of each class to authorize a voluntary bankruptcy filing for it or any of its subsidiaries.  U.S. Coal has sought approval from its Preferred Stockholders in order to authorize a voluntary Chapter 11 filing of U.S. Coal and its remaining non-debtor subsidiaries in compliance with these provisions. However, in the event U.S. Coal is unable to obtain the requisite consent from its Preferred Stockholders, U.S. Coal reserves its rights to contest the validity and enforceability of such consent rights under applicable federal and state law.

- Second Amended and Restated Convertible Note, dated December 7, 2011, of J.A.D. Coal Company, Inc., in the original principal amount of $2,852,578, held by the estate of Aubra Paul Dean ("Dean JAD Seller Note");

- Second Amended and Restated Convertible Note, dated December 7, 2011, of J.A.D. Coal Company, Inc., in the original principal amount of $2,852,578, held by Carl E. McAfee and Julia McAfee as tenants by the entirety ("McAfee JAD Seller Note");

- Second Amended and Restated Promissory Note, dated December 7, 2011, of J.A.D. Coal Company, Inc., in the original principal amount of $500,000, held by the estate of Aubra Paul Dean ("Dean Value Differential Note");

- Second Amended and Restated Promissory Note, dated December 7, 2011, of J.A.D. Coal Company, Inc., in the original principal amount of $500,000, held Carl E. McAfee and Julia McAfee as tenants by the entirety ("McAfee Value Differential Note").

18.    The Dean JAD Seller Note and the McAfee JAD Seller Note are secured by a first priority lien (subject to those of Existing Lenders (as defined below), to the extent still existing) on the assets of, and stock/interests of, the companies constituting the JAD Division pursuant to the following agreements:[2]

- Security Agreement, dated April 15, 2008, among JAD, Sandlick, Fox Knob, Carl and Julia McAfee and Aubra Paul Dean (granting a security interest in equipment and interests in real estate); and

- Security Agreement, dated April 15, 2008, among the Company Carl and Julia McAfee and Aubra Paul Dean (granting a security interest in the stock/interests of the JAD, Fox Knob and Sandlick subsidiaries).

**East Coast Miner LLC**

19.    The Debtors are parties to the following credit agreement and note with East Coast Miner LLC ("ECM I"):

- Second Amended and Restated Credit Agreement, dated August 29, 2008, among U.S. Coal, as borrower, LRR, LR Mining, Oak Hill, SM&J, JAD,

---

[2]    The Dean Value Differential Note and the McAfee Value Differential Note are unsecured.

Fox Knob, Sandlick, Harlan and USCM, as guarantors, Wilmington Trust Company ("WTC"), as collateral agent, and ECM I, as lender, subsequently assigned to ECM I (as amended, the "ECM I Credit Agreement"); and

- Amended and Restated Secured Note, dated September 30, 2009, made by U.S. Coal in favor of ECM I in the original principal amount of $24,018,269.60 (the "ECM I Note").[3]

20.    The Debtors are parties to the following security agreements under the ECM I Credit Agreement: (i) Amended and Restated Security Agreement, dated August 29, 2008, made by U.S. Coal, LRR, LRM, Oak Hill, SM&J, JAD, Fox Knob, Sandlick, Harlan and USCM, as grantors, in favor of WTC, as collateral agent (as amended, the "ECM I Security Agreement") and (ii) certain mortgages and deeds of trust.

21.    Pursuant to the ECM Security Agreement, each grantor granted WTC, as collateral agent, a security interest in all of its rights, title and interest in and to all of its property and assets, whether then owned or thereafter acquired.

22.    The security interests of ECM I in the assets and stock/interests of the entities in the JAD Division are subject to the JAD Intercreditor Agreements (as defined below).

## East Coast Miner II LLC

23.    The Debtors are parties to the following credit agreement and note with East Coast Miner II LLC ("ECM II"):

- Credit Agreement, dated December 7, 2011, among U.S. Coal, JAD, Sandlick and Fox Knob, as borrowers, LRR, Oak Hill, SM&J, LR Mining, Harlan and USCM, as guarantors, WTC, as collateral agent, and ECM II, as lender (the "ECM II Credit Agreement");

- Secured Note, dated December 7, 2011, made by U.S. Coal in favor of ECM II in the original principal amount of $1,322,406.38; and

---

[3]    The note that eventually became the EMC I Note was originally issued in the face amount of $13 million pursuant to a secured note with Fursa Alternative Strategies, LLC. The principal amount grew to $24 million as a result of a series of refinancings.

- Secured Note, dated December 7, 2011, made by JAD, Sandlick and Fox Knob in favor of ECM II in the original principal amount of $5,407,016.22.

24.     The Debtors are parties to the following security agreements under the ECM II Credit Agreement: (i) Security Agreement, dated December 7, 2011, made by U.S. Coal, LRR, LRM, Oak Hill, SM&J, JAD, Fox Knob, Sandlick, Harlan and USCM, as grantors, in favor of WTC,, as collateral agent (as amended, the "ECM II Security Agreement") and (ii) certain mortgages and deeds of trust.

25.     Pursuant to the ECM II Security Agreement, each grantor granted WTC, as collateral agent, a security interest in all of its rights, title and interest in and to all of its property and assets, whether then owned or thereafter acquired.

26.     The security interests of ECM II in the assets and stock of the JAD Division are subject to the 2011 Stock Intercreditor Agreement and the 2011 Asset Intercreditor Agreement (as defined below).

### Dean McAfee Holdings, LLC

27.     At the time of the 2011 Refinancing, the Debtors required an additional $975,027.66 which was lent by Dean McAfee Holdings, LLC pursuant to a Note, dated December 7, 2011, by JAD to Dean McAfee Holdings, LLC, in the original principal amount of $975,027.66 (the "McAfee Note").

28.     Pursuant to the McAfee Note, a security interest in the assets of JAD, Fox Knob and Sandlick, and in the stock and membership interests of these entities, was granted pursuant to (i) Security Agreement, dated December 7, 2011, among JAD, Fox Knob, Sandlick and Dean McAfee Holdings, LLC; and (ii) Security Agreement, dated December 7, 2011, between U.S. Coal and Dean McAfee Holdings, LLC.

29.    Pursuant to the JAD Intercreditor Agreements (as defined below), the security interests were granted the same priority as those of the original notes of the JAD Sellers pursuant to the sale of the JAD Division to U.S. Coal.

### Goodwin and Goggin Secured Notes

30.    U.S. Coal also has the following outstanding secured notes in favor of Keith Goggin and Michael Goodwin: (i) Third Amended and Restated 12% Secured Note due October 31, 2014, dated February 1, 2013, by U.S. Coal in favor of Keith Goggin in the aggregate principal amount of $1,097,620.03 (the "Goggin Note") and (ii) Third Amended and Restated 12% Secured Note due October 31, 2014, dated February 1, 2013, by U.S. Coal in favor of Michael Goodwin in the aggregate principal amount of $1,097,620.03 (the "Goodwin Note").

31.    The Goggin Note and the Goodwin Note are secured by liens on certain equipment and real estate of U.S. Coal and its subsidiaries pursuant to the following security agreements: (i) Security Agreement, dated as of February 1, 2013, made by U.S. Coal, JAD, Sandlick, Fox Knob, LRR, Oak Hill, SM&J, LR Mining, Harlan and USCM in favor of WTC, as collateral agent for Keith Goggin; (ii) Security Agreement, dated as of February 1, 2013, made by the Company, JAD, Sandlick, Fox Knob, LRR, Oak Hill, SM&J, LR Mining, Harlan and USCM in favor of WTC, as collateral agent for Michael Goodwin; and (iii) certain mortgages and deeds of trust.

32.    The Goggin Note and the Goodwin Note are not subject to any of the intercreditor agreements discussed below.

33.    The McAfees, Dean, and McAffee Holdings are collectively referred to herein as the "JAD Lenders". ECM I, ECM II, Goggin and Goodwin are collectively referred to herein as the "Licking River Lenders" and, collectively with the JAD Lenders, the "Pre-Petition Lenders".

**Pryor Cashman Note**

34.     In connection with a dispute related to legal fees incurred prior to the Relief Date, the Company and Pryor Cashman entered into that certain Settlement Agreement, dated March 4, 2013 (the "Pryor Cashman Settlement").  Pursuant to the Pryor Cashman Settlement, as part of the settlement for legal fees, pursuant to an arbitral award, the Company entered into the Secured Promissory Note, dated March 4, 2013, by the Company to Pryor Cashman, in the original principal amount of $2,204,714.13.

35.     Pursuant to a Security Agreement (the "Pryor Cashman Security Agreement") of even date with the Pryor Cashman Settlement, among the Company, LRR, Oak Hill, SM&J, LR Mining, JAD, Sandlick, Fox Knob and Pryor Cashman, the grantors granted a security interest to Pryor Cashman in specified collateral including all personal and fixture property, all deposit accounts, all commercial tort claims, securities and all other investment property and general intangibles.  The security interest  granted under the Pryor Cashman Security Agreement is subordinate to the security interests that existed as of February 18, 2013 (which would include the interests discussed above), security interests that come into existence by no action of the grantors subsequent to such date, and purchase money security interests.

**Intercreditor Agreements**

36.     The assets of the entities comprising the JAD Division (the "JAD Entities") are subject to two sets of intercreditor agreements, setting forth the priority among the different creditors:

- First Amended and Restated Intercreditor and Subordination Agreement, dated September 30, 2009, among JAD, Sandlick, Fox Knob, Aubra Paul Dean, Carl E. McAfee, Julia McAfee, CAMOFI Master LDC ("CAMOFI"), as agent for certain lenders, ECM I and WTC as collateral agent ("Prior Asset Intercreditor Agreement"); and

- Intercreditor and Subordination Agreement (Assets), dated December 7, 2011, among JAD, Sandlick, Fox Knob, ECM II, the JAD Sellers, Dean McAfee Holdings, LLC, ECM I and Wilmington Trust Company ("WTC") as collateral agent under the ECM I Credit Agreement and the ECM II Credit Agreement ("2011 Asset Intercreditor Agreement").

37.    Additionally, the stock/membership interests of the JAD Entities are subject to two sets of intercreditor agreements, setting forth the priority among the different creditors:

- The Intercreditor and Subordination Agreement, dated April 15, 2008, among U.S. Coal, the JAD Sellers, CAMOFI, as agent for certain lenders, ECM I, as successor to JMB Capital Partners Master Fund, L.P., and Merrill Lynch Commodities, Inc. ("Prior Stock Intercreditor Agreement"); and

- Intercreditor and Subordination Agreement (Stock), dated December 7, 2011, among the Company, the JAD Sellers, ECM II, ECM I and WTC as collateral agent under the ECM I Credit Agreement and the ECM II Credit Agreement ("2011 Stock Intercreditor Agreement" and collectively with the Prior Asset Intercreditor Agreement, Prior Stock Intercreditor Agreement, and the 2011 Intercreditor Agreement, the "JAD Intercreditor Agreements").

38.    The JAD Intercreditor Agreements divide the assets of the JAD Entities in existence as of April 15, 2008 (the "JAD Acquisition Date") into the following categories (which correspond to the defined terms used in the JAD Intercreditor Agreements and are collectively defined as the "JAD Collateral"):

- Existing Lender Collateral (i.e., all equipment and interests in real property owned by the JAD Entities on the JAD Acquisition Date subject to the liens of First Tennessee National Bank, CIT Financial, Powell Valley National Bank and their assigns (collectively, the "Existing Lenders")  and on which the JAD Sellers were granted a second lien security interest);

- Unencumbered Collateral (i.e., all equipment, fixtures and other personal property and coal reserves owned on the by the JAD Entities on the JAD Acquisition Date not subject to a security interest of any third party and on which the JAD Sellers were granted a first lien security interest); and

- Other Collateral (i.e., the right to receive a first lien security interest in the Existing Lender Collateral after repayment in full of debt held by Existing Lenders other than First Tennessee National Bank).

The respective categories are further subdivided into the following categories of collateral (which correspond to the defined terms used in the Prior Asset Intercreditor Agreement):

- Encumbered Centrecourt Collateral (i.e., the portion of the Existing Lender Collateral in which CAMOFI has a security interest;

- Unencumbered Centrecourt Collateral (i.e., the portion of the Unencumbered Collateral and Other Collateral in which CAMOFI has a security interest);

- Encumbered ECM Collateral (i.e., all Existing Lender Collateral other than Encumbered Centrecourt Collateral); and

- Unencumbered ECM Collateral (i.e., all Unencumbered Collateral and all Other Collateral other than Unencumbered Centrecourt Collateral).

39.     The respective priorities of each of the lenders can be summarized as follows:

| Existing Lender Collateral | Encumbered Centrecourt Collateral | 1. Existing Lenders<br>2. JAD Sellers<br>WTC as collateral agent for ECM I and ECM II |
| --- | --- | --- |
| | Encumbered ECM Collateral | 1. Existing Lenders<br>2. JAD Sellers<br>WTC as collateral agent for ECM I and ECM II |
| Unencumbered Collateral; Other Collateral | Unencumbered Centrecourt Collateral | 1. JAD Sellers<br>2. WTC as collateral agent for ECM I and ECM II |
| | Unencumbered ECM Collateral | 1. JAD Sellers<br>2. WTC as collateral agent for ECM I and ECM II |
| JAD Wash Plant | 1. JAD Sellers<br>2. WTC as collateral agent for ECM I and ECM II | |

40.    In addition to the security interests described above, WTC, as collateral agent for ECM I and ECM II, has a security interest in substantially all of the assets of the JAD Entities that are not otherwise part of the JAD Collateral.

41.    Under the 2011 Stock Intercreditor Agreement, the priority of the lenders as to their respective security interests in the stock/membership interests of the JAD Entities are: first, JAD Sellers and Dean McAfee Holdings, LLC, WTC as collateral agent for ECM I, and third, WTC as collateral agent for ECM II.

## RELIEF REQUESTED

42.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary of the terms of the Debtors' proposed use of Cash Collateral:

**Budget**          The Licking River Debtors and the JAD Debtors shall comply with independent budgets (as the same may be updated in accordance with the terms of this Interim Order, the "Budgets"), and with the initial Budgets (the "Initial Budgets"), attached hereto as **Exhibit 1**.   The Licking River Debtors and the JAD Debtors shall be deemed to be in compliance with their respective Budgets so long as:

(i)    Actual "Cash Receipts" is not less than ninety percent (90%) of the projected "Cash Receipts" line item in such Budget for a rolling four (4) week period commencing for the week ended June 13, 2014 (or a shorter period until a four (4) week period from the Relief Date shall have elapsed), such variance tested on each Thursday for the period ending in the immediately preceding week;

(ii)    Actual "Operating Disbursements" is not more than one hundred ten percent (110%) of the projected "Operating Disbursements" line item in such Budget for a rolling four-week period commencing for the week ended June 13, 2014 (or a shorter period until a four week period from the Relief Date shall have elapsed), such variance tested on each Thursday for the period ending in the immediately preceding week; and

(iii)    Actual "Ending Cash" shall not be less than eighty-five percent (85%) of the projected "Ending Cash" line item in such Budget for a rolling four-week period commencing for the week ended June 13, 2014 (or a shorter period until a four week period from the Relief Date shall

have elapsed), such variance tested on each Thursday for the period ending in the immediately preceding week.

Commencing on the first Thursday following the week of the Relief Date and continuing every Thursday thereafter, the Licking River Debtors and the JAD Debtors shall deliver to the Licking River Lenders or the JAD Lenders, as applicable, a variance analysis, in form and scope reasonably acceptable to the Licking River Lenders and the JAD Lenders, as applicable, comparing actual results to the Initial Budgets.  Any amendment to an Initial Budget (each, an "Amended Initial Budget") shall require (i) in the case of the Licking River Debtors, the consent of the Licking River Lenders in their sole discretion and (ii) in the case of the JAD Debtors, the consent of the Pre-Petition Lenders in their sole discretion; provided, however, that no Pre-Petition Lender shall be under any obligation to consent to an Amended Initial Budget.  Amendments to the Initial Budgets need not be approved by this Court or filed with this Court, provided that copies shall be provided to the U.S. Trustee and counsel to any Creditors' Committee.

**Cash Management:** The Debtors shall maintain their cash management arrangements in a manner consistent with that described in the applicable "first-day" order granting the relief requested by the Debtors' cash management motion (the "Cash Management Motion").  The Cash Management Motion shall provide for segregated and independent cash management systems for the Licking River Debtors and the JAD Debtor.

**Challenge Period:** A Creditors' Committee, if any is appointed shall have the later of ninety (90) days after the appointment of such Creditors' Committee, if any, and (ii) any such later date agreed to in writing by all of the Pre-Petition Lenders in their respective sole and absolute discretion (the time period established by the later of the foregoing clauses (i) and (ii), the "Challenge Period") to file an adversary proceeding challenging the validity, enforceability, priority or extent of the Secured Obligations or the liens on the Prepetition Collateral securing the Secured Obligations held by or on behalf of the Licking River Lenders or the JAD Sellers, as applicable, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Licking River Lenders or the JAD Sellers, as applicable, in connection with any matter related to the Secured Obligations or the Prepetition Collateral.

**Adequate Protection:** As adequate protection, each Pre-Petition Lenders shall be granted the following claims, liens, rights, and benefits, in each case subject and subordinate to the Carve-Out and payment in full of the obligations benefiting from the Carve-Out:

(a)    <u>Superpriority Claims</u>.   An allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on account of the Adequate Protection Obligations (the "<u>Superpriority Claim</u>").  Subject to the Carve-Out, the Superpriority Claim shall be an allowed claim against (i) in the case of the Licking River Lenders, each of the Debtors (jointly and severally) and (ii) in the case of the JAD Sellers, each of the JAD Debtors (jointly and severally), in each case with priority over any and all administrative expenses and all other claims asserted against such Debtors, now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment; provided that the Superpriority Claim may not be paid from Avoidance Proceeds (as defined herein) on account of the Superpriority Claim pending entry of the Final Order.

(b)    <u>Adequate Protection Liens</u>.   To secure the Adequate Protection Obligations, effective as of the Relief Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Pre-Petition Lenders of any Postpetition Collateral (as defined herein), the following security interests and liens are hereby granted to the Collateral Agent on behalf of itself and the Pre-Petition Lenders (all such liens and security interests, the "<u>Adequate Protection Liens</u>"), in each case subject to the Carve-Out:

(i)    <u>Liens on Unencumbered Property</u>.   Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code and subject to Paragraph 12(c) hereof, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement first priority lien, to the fullest extent permissible by applicable law, on, and security interest in, all property (including any previously unencumbered property), whether now owned or hereafter acquired or existing and wherever located, of (x) in the case of the Licking River Lenders, each Debtor and each such Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code) and (y) in the case of the JAD Lenders, each JAD Debtor and each such JAD Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code),, of any kind or nature whatsoever, real or personal, tangible or intangible, and now

existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, Accounts Receivable (as defined herein) subject to a certain permitted exceptions, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of or equity or ownership interests in each Debtor, money, investment property, and causes of action, in each case that is not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Relief Date or (y) valid and unavoidable liens in existence immediately prior to the Relief Date that are perfected after the Relief Date solely to the extent permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Collateral"); provided that the Unencumbered Collateral shall not include the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions"); and

(ii)     Liens Junior to Certain Existing Liens.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code and subject to Paragraph 12(c) hereof, a valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all property, whether now owned or hereafter acquired or existing and wherever located, of (x) in the case of the Licking River Lenders, each Debtor and each such Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code) and (y) in the case of the JAD Lenders, each JAD Debtor and each such JAD Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, Accounts Receivable subject to certain permitted exceptions, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights,

supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of or equity or ownership interests in each Debtor, money, investment property, and causes of action (the "Junior Collateral" and, together with the Unencumbered Collateral and the Prepetition Collateral, the "Postpetition Collateral").

(c)    Priority of Adequate Protection Liens.  The Adequate Protection Liens granted to the Pre-Petition Lenders hereunder shall have the same relative priority as the Prepetition Liens held by each of the Pre-Petition Lenders as of the Relief Date; provided, however, that none of the Adequate Protection Liens granted to the JAD Lenders shall extend to any of the property or assets of the Licking River Debtors (whether now owned or hereafter acquired or existing and wherever located).

**Pryor Cashman Adequate Protection**    As adequate protection, effective as of the Relief Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Pryor Cashman of any Postpetition Collateral, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, Pryor Cashman is hereby granted a valid, continuing, enforceable, fully-perfected, non-avoidable additional and replacement second priority lien, to the fullest extent permissible by applicable law, on, and security interest in, all Unencumbered Collateral (which liens and security interests shall be, in each case, subordinate and junior to the Adequate Protection Liens and subject to the Carve-Out); provided that the Unencumbered Collateral shall not include Avoidance Actions or Accounts Receivable (all such liens and security interests, the "Pryor Cashman Adequate Protection Liens").

**Additional Adequate Protection**

(a)    JAD Lenders' Adequate Protection Payments:  The JAD Debtors shall pay the JAD Lenders adequate protection cash payments in the sum of $12,500.00 per week, beginning on the date of entry of this Interim Order, and continuing thereafter without modification; unless any modification is agreed to in writing by the JAD Lenders or by further order of this Court.  Such payments shall be applied to reduce the JAD Lender Obligations as agreed upon between the JAD Lenders and the JAD Debtors.

(b)    Licking River Lenders' Fees and Expenses:  The Licking River Debtors shall pay within seven (7) days of presentment of an invoice to the Licking River Debtors describing in customary detail (redacted for

privilege and work product) the actual, reasonable, and documented fees, costs and expenses of the Licking River Lenders, including attorneys retained by the Licking River Lenders without further order of, or application to, this Court or notice to any party, to the extent such amounts are provided for in the Licking River Budget; provided that the Licking River Lenders shall concurrently provide such invoice to the U.S. Trustee and counsel to any Creditors' Committee; provided further, that the actual, reasonable, and documented fees, costs and expenses of the Licking River Lenders, including attorneys retained by the Licking River Lenders, whether incurred before or after the Relief Date, shall continue to be part of the Secured Obligations and be added to the Licking River Lenders' claims to the extent they exceed the amounts provided for in the Budget and are not otherwise paid in cash by the Licking River Debtors.

**Carve Out:**       For purposes hereof, the "Carve-Out" shall mean, with respect to the Licking River Debtors and the JAD Debtors, collectively, the sum of (i) all fees required to be paid to the clerk of this Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (v) below); (ii) severance taxes and other taxes for which there is personal liability for officers and directors under applicable state or federal law that are due and payable as of the Relief Date and thereafter (iii) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (v) below); (iv) subject to the Professionals Monthly Cap with respect to Professional Fees incurred by Professional Persons retained by the Creditors' Committee, to the extent allowed at any time, whether by interim order, procedural order or otherwise, all fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or the Creditors' Committee pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Professional Persons") at any time before or on the first business day following delivery by the Pre-Petition Lenders of a Carve-Out Trigger Notice (as defined herein), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"); and (v) after the first business day following delivery by the Pre-Petition Lenders of the Carve-Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (x) all Professional Fees of Professional Persons retained by the Debtors; and (y) the payment of Professional Fees of Professional Persons incurred by the Creditors' Committee, in an aggregate amount for clauses (x) and (y) not to exceed $500,000 incurred on and after the Trigger Date (the amount set forth in clauses (x) and (y) being the "Post-Carve Out Trigger Notice Cap"); provided that nothing herein shall be construed to impair the ability of any party to object to the reasonableness of the fees, expenses, reimbursement or compensation described in clauses (iv) and

(v) referred to above.  Notwithstanding the foregoing, (x) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Pre-Petition Lenders, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Loan Documents in favor of the Pre-Petition Lenders (whether in such capacity of otherwise), including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable nonbankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Pre-Petition Lenders hereunder; (c) attempts to prevent, hinder or otherwise delay any of the Pre-Petition Lenders' assertion, enforcement or realization upon any Prepetition or Postpetition Collateral in accordance with the Loan Documents and this Interim Order; or (d) paying any amount on account of any claims arising before the Relief Date unless such payments are approved by an order of this Court and (y) so long as the Carve-Out Trigger Notice shall not have been delivered, the Carve-Out shall not be reduced by the payment of Professional Fees allowed  at any  time by this Court; provided,  however, that an amount equal to the Investigation Budget (as defined herein) may be utilized by the Creditors' Committee, if any, solely to investigate any such claims, liens, causes of such action, adversary proceedings or other litigation.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by a Pre-Petition Lender to a Debtor, such Debtor's counsel, the U.S. Trustee, the other Pre-Petition Lenders and lead counsel for the Creditors' Committee, upon the occurrence and during the continuance of a Termination Event (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

43.    By this Motion, the Debtors seek the immediate use of Cash Collateral in order to ensure the Debtors' continued operations and to effectuate a restructuring of the Debtors' balance sheet.  The use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors, and is essential to the continuation of the Debtors' business operations.  The use of Cash Collateral will provide the Debtors with the necessary liquidity to fund their operations, working capital needs and general corporate purposes during the course of these chapter 11 cases, until such time as the Debtors can be reorganized.  This use of Cash Collateral will also provide Debtors with the ability comply with their regulatory obligations,

further enabling continued operation of their businesses.  Absent access Cash Collateral, the Debtors cannot maintain uninterrupted operations, resulting in the immediate cessation of operations and the piecemeal fire sale liquidation of the Debtors' businesses, severe employee dislocation and crippling losses for vendors and customers.  The Debtors' customers, employees and all of the Debtors' constituents depend on the Debtors' use of Cash Collateral so that the Debtors may continue operating.

44.     Obtaining consensual use of Cash Collateral on the terms proposed are well within the sound discretion of the Debtors, as it will allow the Debtors to stabilize their operations and preserve and maximize the value of their estates for the benefit of all parties in interest

45.     On an interim basis, the Debtors respectfully request that this Court grant them the authority to use Cash Collateral pursuant to the Interim Order and Interim Budget and to provide the Pre-Petition Lenders with Adequate Protection.

46.     For the reasons set forth herein, the Debtors believe that authorization to use Cash Collateral is in the best interests of the Debtors, their estates and their stakeholders, and should be granted.

47.     The Debtors have worked together with its professionals to assess the Debtors' liquidity concerns and identify possible sources of financing during these cases, including extensive discussions with the Pre-Petition Lenders.  After completing an extensive analysis of the Debtors' cashflow, it appeared that it the Debtors could initially fund these cases solely through the use of Cash Collateral.

## BASIS FOR RELIEF REQUESTED

48.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's Cash Collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . .  unless—
>
> > (A)    each entity that has an interest in such cash collateral consents; or
> >
> > (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Further, Section 363(e) provides that "on request of an entity that has an interest in property . . .  proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

49.    The Debtors have satisfied the requirements of Sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.  First, as explained above, the Pre-Petition Agent and Pre-Petition Lenders have consented to the use of the Cash Collateral.  Second, as described above, the Debtors are providing the Pre-Petition Lenders with replacement liens on the Pre-Petition Lender's collateral.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under Section 363(c)(2) of the Bankruptcy Code.

50.    As set forth above, the Debtors' immediate use of Cash Collateral is absolutely necessary in order to enable the Debtors to meet the obligations of their ordinary operating costs and expenses during the pendency of these Chapter 11 Cases.  Among other things, the use of Cash Collateral will enable the Debtors to preserve business relationships with their vendors and customers, pay their employees, and satisfy other ordinary operational costs that are essential to their continued and remaining operations of their businesses.

51.      In the absence of the immediate authorization to use Cash Collateral, the Debtors'
ability to continue their remaining operations in the ordinary course of business will be
jeopardized and the failure to do so would no doubt result in immediate and irreparable harm to
the Debtors' estates, employees, customers and all stakeholders by virtue of the loss of
significant going concern value.   Thus, the use of Cash Collateral is absolutely critical to the
Debtors' continued viability and the preservation and maximization of the value of the Debtors'
estates.

52.      The adequate protection proposed by the Debtors is reasonable and appropriate
and should be approved.   Bankruptcy Code section 363(e) requires that the debtor adequately
protect the secured creditors' interest in property to be used by a debtor against any diminution in
value of such interest resulting from the debtor's use of the property during the chapter 11 cases.
"The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the
implications of the examples of adequate protection listed in § 361." *In re Beker Indus. Corp.*, 58
B.R. 725, 736 (Bankr. S.D.N.Y. 1986).   Section 361 of the Bankruptcy Code contains a non-
exhaustive list of acceptable forms of adequate protection, including additional liens,
replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11
U.S.C. § 361.

53.      The issue of what constitutes adequate protection must be decided on a case-by-
case basis. *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty Sw.
Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *Beker Indus.*, 58 B.R. at 736.   The focus of
the adequate protection requirement is to preserve the secured creditor's position at the time of
the bankruptcy filing and protect the secured creditor from diminution in the value of its
collateral during the reorganization process.   *Mosello*, 195 B.R. at 288 (citation omitted); *Beker*

*Indus.*, 58 B.R. at 736; *In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004)

("The legislative history of section 361 of the Bankruptcy Code, which sets forth how adequate

protection may be provided under section 363, makes clear that the purpose of providing

adequate protection is to insure that the secured creditor receives the value for which the creditor

bargained for prior to the debtor's bankruptcy.").  "However, neither the legislative history nor

the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by

the parties." *Worldcom*, 304 B.R. at 619; see *Beker Indus.*, 58 B.R. at 741 ("Adequate protection,

not absolute protection, is the statutory standard.").

54.    Here, as discussed further below, the Prepetition Lenders' secured interests in the

Prepetition Collateral are adequately protected in light of (a) the Debtors' use of Cash Collateral

to preserve value; and (b) the protections to be provided the Prepetition Secured Parties against

Diminution in Value.

55.    Courts generally have found that secured creditors are adequately protected and

have authorized the use of cash collateral where the proposed continued use of Cash Collateral

will preserve the value of the secured creditors' other collateral, providing adequate protection.

*See, e.g., In re Salem Plaza Assocs.*, 135 B.R, 753, 758 (Bankr. S.D.N.Y. 1992) (holding that

debtor's use of cash collateral from shopping center to pay operating expenses, thereby

"preserv[ing] the base that generates the income stream," provided adequate protection to the

secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 104-05 (Bankr. S.D.N.Y.

1991) (noting use of cash collateral would "preserve or enhance the value of the building

[collateral] which, in turn, will protect the collateral covered by [the] mortgage").  Indeed, courts

have considered the preservation and enhancement of collateral to be a critical component of

adequate protection.  For example, in determining the sufficiency of adequate protection, courts

have considered "whether the value of the debtor's property will increase as a result of the" use of the collateral. *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

56.     The Debtors propose to provide the Prepetition Secured Parties protection against any depreciation in the value of the Prepetition Collateral.  As set forth in section 361 of the Bankruptcy Code, additional liens and "replacement liens to the extent" of diminution in value of prepetition collateral are an accepted form of adequate protection.

57.     The Prepetition Secured Parties are being granted the Adequate Protection Liens on the Adequate Protection Collateral in the same priority as existed prior to the Petition Date to adequately protect against any the Diminution in Value of the Prepetition Collateral.  In addition, the Prepetition Secured Parties will each be granted the Administrative Superpriority Claim.

58.     The foregoing forms of adequate protection will sufficiently protect the interests of the Prepetition Secured Parties in the Cash Collateral.  Thus, the adequate protection proposed by the Debtors is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code section 363(c).

59.     The proposed use of Cash Collateral subjects the security interests of the Prepetition Lenders to the Carve Out.  Such carve out for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committees can retain assistance from counsel.  *See Ames*, 115 B.R. at 40.  The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *Id.* at 38 (observing that courts insist on carve out for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

60.     Additionally, the Carve Out protects against administrative insolvency during the course of the cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the future official committee of unsecured creditors notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.  Moreover, the scope of the proposed Carve Out is well in line with the caps for U.S. Trustee and professional fees approved in other chapter 11 cases.  *See, e.g., In re The Great Atl. & Pac. Tea Co*., No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving a $15 million carve out cap in connection with an $800 million DIP facility); *In re General Growth Properties, Inc.*, No. 09-11977 (Bankr. S.D.N.Y. Jun. 1, 2009) (approving a $25 million carve out cap in connection with a $400 million DIP facility); *In re Quebecor World (USA) Inc.*, No. 08-10152 (Bankr. S.D.N.Y. Jan. 21, 2008) (approving a $20 million carve out cap in connection with a $750 million DIP facility); *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Oct 8. 2005) (approving a $35 million carve out cap in connection with a $2 billion DIP facility); *In re Delta Air Lines, Inc.*, No. 05-17923 (Bankr. S.D.N.Y. Oct 6, 2005) (approving a $35 million carve out cap in connection with a $1.7 billion DIP facility).

61.     The Carve Out also protects the lien rights of pre-petition secured creditors other than the Pre-Petition Lenders.

62.     The proposed Interim Order provides that upon the occurrence of an Event of Default, the automatic stay of Section 362 automatically will be modified to enable the Pre-Petition Lenders, to revoke the Debtors' right to use Cash Collateral and collect and apply proceeds of Cash Collateral; provided, however, that the DIP Agent shall provide three (3) business days written notice to counsel to the Debtors, counsel to the Committee and the U.S. Trustee by facsimile, telecopy, e-mail or otherwise.

63.     Stay modification provisions of this sort are ordinary and usual features of post-petition financing, have been approved by Courts in this district, and in the Debtors' business judgment, are reasonable under the circumstances.  *See In re Black Diamond Mining Company, LLC,* (Case No. 08-70066, Bankr. E.D. Ken. Feb. 27, 2008).  Therefore, the Court should modify the automatic stay to the extent contemplated by the Final Order.

64.     The Court may grant interim relief in respect of a motion filed pursuant to Section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

65.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the immediate use of Cash Collateral, is not granted promptly.  The Debtors have an immediate need for access to liquidity so that they may, among other things, continue the operation of their businesses, maintain their relationships with customers, meet payroll, pay necessary and appropriate capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their crucial working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.  Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no longer than 30 days from the entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

66.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon

the Notice Parties listed below.  The Debtors further request that the Court consider such notice

of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

### Waiver of Bankruptcy Rules 6004(a) and (h)

67.     In order to ensure the continuance of the Debtors' business on an uninterrupted

basis, the Debtors also seek a waiver of the notice requirements under Bankruptcy Rule 6004(a)

and the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule

6004(h).

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested

herein and such other and further relief as is just and proper.


Respectfully submitted,

DELCOTTO LAW GROUP PLLC


/s/ Laura Day DelCotto Esq.
KY Bar No. 81763
Amelia Martin Adams, Esq.
KY Bar No. 93038
200 North Upper Street
Lexington, KY  40507
Telephone:  (859) 231-5800
Facsimile:   (859) 281-1179
ldelcotto@dlgfirm.com
aadams@dlgfirm.com

and

NIXON PEABODY LLP


/s/ Dennis J. Drebsky, Esq.
NY Bar No. 4350633
Christopher M. Desiderio, Esq.
NY Bar No. 1181007
437 Madison Avenue
New York, NY 10022-7039
Telephone:  (212) 940-3000
Facsimile:   (212) 940-3111
ddrebsky@nixonpeabody.com
cdesiderio@nixonpeabody.com
(*pro hac vice* pending)

COUNSEL FOR
ALLEGED DEBTORS
(UNDER PENDING APPLICATION)

Z:\Cash Collateral Mot 20140609.doc