UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND, LONDON, AND LEXINGTON DIVISIONS

IN RE:                                          CHAPTER 7

LICKING RIVER MINING, LLC, *et al.*             CASE NO. 14-10201

       DEBTORS                                  JOINTLY ADMINISTERED

---

**SUMMARY SHEET ACCOMPANYING FINAL FEE APPLICATION
OF GASSRATNER ADVISORY & CAPITAL GROUP, LLC FOR ALLOWANCE OF
COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF
EXPENSES INCURRED DURING THE PERIOD FROM JUNE 12, 2014
THROUGH AND INCLUDING APRIL 24, 2015**

| | |
|---|---|
| Name of Applicant: | GlassRatner Advisory & Capital Group, LLC |
| Name of Client: | Licking River Resources, Inc., S. M. & J., Inc., J.A.D. Coal Company, Inc., Fox Knob Coal Co., Inc., U.S. Coal Corporation, Harlan County Mining, LLC, Oak Hill Coal, Inc., Sandlick Coal Company, LLC, and U.S. Coal Marketing, LLC |
| Petition Date: | Licking River Mining, LLC: May 22, 2014<br><br>Licking River Resources, Inc. and Fox Knob Coal Co., Inc.: May 23, 2014<br><br>S. M. & J., Inc.: June 3, 2014<br><br>J. A. D. Coal Co., Inc.: June 4, 2014<br><br>U.S. Coal Corporation: June 10, 2014<br><br>Harlan County Mining, LLC, Oak Hill Coal, Inc., Sandlick Coal Company, LLC, and U.S. Coal Marketing, LLC: November 4, 2014 |
| Retention Date: | Licking River Mining, LLC, Licking River Resources, Inc., Fox Knob Coal Co., Inc., S. M. & J., Inc., and J. A. D. Coal Co., Inc.: June 12, 2014 |

|  | U.S. Coal Corporation: June 27, 2014<br><br>Harlan County Mining, LLC, Oak Hill Coal, Inc., Sandlick Coal Company, LLC, and U.S. Coal Marketing, LLC: November 19, 2014 |
|---|---|
| Date of Order Approving Retention: | July 12, 2014 per Final Order Authorizing the Employment of GlassRatner Advisory & Capital Group as Financial Advisor for All Debtors and Debtors in Possession [Doc 277] |
| Period for Which Compensation and Reimbursement is Sought: | June 12, 2014 through and including April 24, 2015 |
| Total Amount of Compensation Sought as Actual, Reasonable and Necessary Excluding Gap Claims: | $1,484,553.50 |
| Total Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary Excluding Gap Claims: | $74,662.90 |
| Total Amount of Compensation Previously Awarded as Actual, Reasonable and Necessary Excluding Gap Claims: | $695,332.76 |
| Total Amount of Expense Reimbursement Previously Awarded as Actual, Reasonable and Necessary: | $49,684.38 |
| Total Amount of Compensation and Expense Reimbursement Previously Paid by the Debtors: | $745,017.14 |
| Total Gap Claims Pursuant to 11 U.S.C. § 502(f): | $30,077.16 |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND, LONDON, AND LEXINGTON DIVISIONS

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| LICKING RIVER MINING, LLC, *et al.* | CASE NO. 14-10201 |
| DEBTORS IN POSSESSION | JOINTLY ADMINISTERED |

**FINAL APPLICATION FOR APPROVAL OF COMPENSATION
FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES
INCURRED BY GLASSRATNER ADVISORY & CAPITAL GROUP, LLC
AS FINANCIAL ADVISOR FOR THE DEBTORS FOR THE PERIOD
JUNE 12, 2014 THROUGH APRIL 24, 2015**

GlassRatner Advisory & Capital Group, LLC (the "Applicant" or "GlassRatner"), by and through undersigned counsel, hereby files its Final Application for Approval of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Financial Advisors for the Debtors for the period June 12, 2014 through April 24, 2015 (the "Fee Application"). The Fee Application seeks final approval and allowance of fees in the amount of $1,484,553.50 (the "Fees") and the reimbursement of expenses in the amount of $74,662.90 (the "Expenses") for a total request of $1,559,216.40 (the "Total Request") on account of services performed and expenses incurred as financial advisor to the Debtors during the period of June 12, 2014 through April 24, 2015 (the "Fee Period"). In support of this Fee Application, GlassRatner respectfully represents as follows:

3

## PRELIMINARY STATEMENT

These cases were commenced approximately one year ago under exceedingly difficult and tumultuous circumstances through four separate involuntary bankruptcy petitions.  The Debtors' coal mining operations were run through two separate divisions (comprised of ten separate legal entities), each of which had its own complex capital structure, was separately managed, and reflected different mining dynamics, both from a production and sales perspective. GlassRatner shepherded the Debtors through these cases by providing critical guidance and financial advisory services at a time when the Debtors were in turmoil.  Among other things, GlassRatner assisted the Debtors with transitioning into chapter 11, obtaining access to cash collateral and other necessary relief, communicating and ensuring financial transparency with key parties in interest, developing and pursuing an initial strategy that contemplated a plan process for both divisions, and quickly adapting to changing circumstances and ultimately pivoting to a sale process for each division.

Initially, the key parties in these cases were supportive of the plan process strategy as the best way to maximize value.  No other restructuring alternative was proposed and all parties allowed the plan strategy to proceed without objection.  GlassRatner worked tirelessly to compile detailed projections to facilitate discussions with potential third party funding sources for a capital raise that would be necessary to fund the strategy.  However, due to a sharp decline in market pricing and demand for coal and other external factors not within the control of the Debtors or GlassRatner, the plan strategy was rendered no longer feasible.  As such, the Debtors, with GlassRatner's assistance, pivoted to conducting a sale process resulting in the successful sale of each division.  Although the sales maximized value under the changed circumstances, the

Licking River sale did not generate sufficient cash proceeds to satisfy all administrative claims and these cases were converted to chapter 7.

Ultimate success with efforts to reorganize can never be guaranteed and is appropriately not a requirement for the allowance of reasonable professional compensation under section 330 of the Bankruptcy Code.  Notwithstanding the ultimate conversion of these cases, the earlier effort to reorganize through a plan process was reasonable under the circumstances and all of GlassRatner's services in connection with the plan strategy, the ultimate sale of both divisions, and all other aspects of these cases benefitted the Debtors' estates or were reasonably likely to benefit the estates at the time they were performed.  GlassRatner's fees and expenses were the subject of criticism by the Official Committee of Unsecured Creditors and the U.S. Trustee earlier in these cases [Doc. 787 and 788].  For the reasons explained in GlassRatner's filed response to those objections [Doc. 1100] and below, this criticism and related objections are unfounded and unsupported by the record of these cases.  In sum, they do not present any basis for disallowance of GlassRatner's requested fees and expenses.  For these reasons and those set forth below, the Fees and Expenses are fully compensable and should be approved and allowed as reasonable compensation for GlassRatner's services on a final basis.

I.      **NARRATIVE SUMMARY**

   A. **Status of Proceeding – Jurisdiction and Venue**

      1.      On May 22, 2014, an involuntary petition seeking relief under Chapter 11 of the Bankruptcy Code was filed against Debtor Licking River Mining, LLC ("LR Mining").  On May 23, 2014, involuntary petitions seeking relief under Chapter 11 of the Bankruptcy Code were filed against Debtor Licking River Resources, Inc. ("LRR") and Fox Knob Coal Co., Inc. ("Fox Knob").  On June 3, 2014, an involuntary petition seeking relief under Chapter 11 of the

Bankruptcy Code was filed against Debtor S. M. & J., Inc. ("SMJ")    On June 4, 2014, an involuntary petition seeking relief under Chapter 11 of the Bankruptcy Code was filed against J. A. D. Coal Co., Inc. ("JAD").  On June 10, 2014, an involuntary petition seeking relief under Chapter 11 of the Bankruptcy Code was filed against U.S. Coal Corporation ("U.S. Coal").  The foregoing involuntary petitions are collectively referred to as the "Involuntary Petitions." Collectively, LR Mining, LRR, Fox Knob, SM&J, JAD, and U.S. Coal are hereinafter referred to as the "Debtors."

2.      In response to the Involuntary Petitions, on June 9, 2014, LR Mining, LRR, Fox Knob, SM&J, and JAD (collectively, the "Subsidiary Debtors") acknowledged that they did not have a defense to allegations contained by filing their Consolidated Answer and Consent to Entry of Order for Relief and Reservation of Rights [Doc 8].  On June 12, 2014, the Court entered an order for relief in each of the LR Mining, LRR, Fox Knob, SM&J, and JAD cases.  In response to its Involuntary Petition, on June 23, 2014, U.S. Coal acknowledged that it did not have a defense to allegations contained by filing its Answer and Consent to Entry of Order for Relief and Reservation of Rights.  On June 27, 2014, the Court entered an order for relief in U.S. Coal's bankruptcy case.

3.      On June 13, 2014 and June 27, 2014, the Court entered Orders [LR Mining Doc 91, U.S. Coal Doc 48] authorizing the joint administration of these Chapter 11 cases pursuant to Fed. R. Bankr. P. 1015(b) for procedural purposes.

4.      On November 4, 2014, voluntary Chapter 11 petitions were filed for each of Harlan County Mining, LLC, Oak Hill Coal, Inc., Sandlick Coal Company, LLC, and U.S. Coal Marketing, LLC, in accordance with the Court's order that authorized, compelled, and directed these Debtors to file Chapter 11 petitions [Doc 660].

5.      On April 24, 2015, the Court converted these cases from Chapter 11 to Chapter 7 [Doc 1303] and a Chapter 7 Trustee was subsequently appointed.

6.      This Court has jurisdiction over the Debtors' Chapter 7 cases under 28 U.S.C. §§ 157 and 1334.  This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

7.      The Licking River Lenders have asserted a lien on all of the Debtors' assets, including all cash collateral of the Debtors.  See Final Cash Collateral Order at ¶¶ 7(a)-(d), (k). The Final Cash Collateral, however, provides for a Carve-Out from the Licking River Lenders' alleged cash collateral for purposes of paying the allowed fees and expenses of professionals engaged by the Debtors and the Committee.   The Carve-Out is defined in the Final Cash Collateral Order as follows:

> The Carve-Out.  For purposes hereof, the "Carve-Out" shall mean, with respect to the Debtors, collectively, the sum of (i) all fees required to be paid to the clerk of this Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (v) below); (ii) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (v) below); (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or the Creditors' Committee pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Professional Persons") at any time before or on the first business day following delivery by the Pre-Petition Lenders of a Carve-Out Trigger Notice (as defined herein), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"); and (iv) after the first business day following delivery by the Licking River Lenders of the Carve-Out Trigger Notice (the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (x) all Professional Fees of Professional Persons retained by the Debtors; and (y) all Professional Fees of Professional Persons incurred by the Creditors' Committee, in an aggregate amount for clauses (x) and (y) not to exceed $500,000 incurred on and after the Trigger Date (the amount set forth in clauses (x) and (y) being the "Post-Carve Out Trigger Notice Cap"); provided that nothing herein shall be construed to impair the ability of any party to object to the reasonableness of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv)

referred to above; provided, further, that if the Debtors' right to use Cash Collateral is not terminated within fifteen (15) days of the Trigger Date, the Post-Carve-Out Trigger Notice Cap shall not apply.  Notwithstanding the foregoing, (x) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation (other than as provided below), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Licking River Lenders, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Loan Documents in favor of the Licking River Lenders (whether in such capacity of otherwise), including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable nonbankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Licking River Lenders hereunder; (c) attempts to prevent, hinder or otherwise delay any of the Licking River Lenders' assertion, enforcement or realization upon any Prepetition or Postpetition Collateral in accordance with the Loan Documents and this Final Order; or (d) paying any amount on account of any claims arising before the Relief Dates unless such payments are approved by an order of this Court and (y) so long as the Carve-Out Trigger Notice shall not have been delivered, the Carve-Out shall not be reduced by the payment of Professional Fees allowed at any time by this Court; provided, however, that an amount equal to the Investigation Budget (as defined herein) may be utilized by the Creditors' Committee solely to investigate any such claims, liens, causes of such action, adversary proceedings or other litigation against the Licking River Lenders.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by a Licking River Lender to a Debtor, such Debtor's counsel, the U.S. Trustee, the other Licking River Lenders, the JAD Lenders, counsel to CAMOFI and lead counsel for the Creditors' Committee, upon the occurrence and during the continuance of a Termination Event (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Final Cash Collateral Order at ¶ 12(e).

8.      For periods before the "Trigger Date," the Carve-Out includes "all fees, costs, and expenses" of professionals for the Debtors and the Committee, so long as such fees are ultimately allowed by this Court and regardless of "whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice."

9.      For periods after the Trigger Date, there is an aggregate $500,000 cap on the Carve-Out amount for professionals for the Debtors and the Committee.

10.     Pursuant to an agreed order with the ECM Parties entered by this Court on March 12, 2015 (the "March Agreed Order") [Dkt. No. 1033], the Trigger Date was deemed to occur on March 1, 2015.  In connection with the March Agreed Order, the professionals for the Debtors and the Committee agreed to allocate the $500,000 cap among each professional.  Pursuant to the March Agreed Order GlassRatner's allocated portion of the cap was $108,553.  An additional $15,000 was allocated to GlassRatner for fees incurred after April 1, 2015 – making GlassRatner's total post-Trigger Date Carve-Out $123,553.

11.     Consequently, under the Final Cash Collateral Order, (a) any allowed fees and expenses of GlassRatner accrued prior to March 1, 2015 are part of the Carve-Out and should be paid from alleged cash collateral, and (b) GlassRatner post March 1, 2015 fees are part of the Carve-Out and should be paid from alleged cash collateral so long as they do not exceed $123,553.  GlassRatner's fees and expenses for periods after March 1, 2015 equal $181,876.71. Applicant's post-Trigger Date fees and expenses exceed the amounts budgeted during these two months by approximately $58,000.  Applicant spent a significant amount of time handling matters in the closing months of the cases including the implementation of complex closing issues related to the Licking River and JAD sale transactions.

12.     It is Applicant's position that all allowed fees and expenses that accrued from the Relief Dates through and including February 28, 2015 are covered by the Carve-Out contained in the Final Order, and should be paid in full from the Licking River Lenders' cash collateral. Allowed fees and expenses that accrued from the Trigger Date of March 1, 2015 through the Conversion Date of April 24, 2015 are also covered by the Carve-Out and related provisions subject to numerous factors including but not limited to the services and benefits provided to the Estates during the post-Trigger Date time periods, the benefits provided to the Licking River

Lenders during the post-Trigger Date time periods in preserving and disposing of assets, and any other issues which may arise.  Applicant seeks payment in full of all outstanding professional fees and administrative claims that it may be allowed in the cases from the Carve-Out to the maximum extent warranted and allowed by law and equity.  To the extent that any such allowed professional fees and expenses exceed the Carve-Out, such amount will share with any other allowed chapter 11 administrative claimants in each Estate.

13.     Upon information and belief, Applicant states that the following funds have been claimed to constitute the cash collateral of the Licking River Lenders, and are therefore subject to the Carve-Out:  (a) the $2,000,000 that Debtors received from South Carolina Electric & Gas Company ("SCANA") pursuant to Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019 [Doc 1096], which sum is currently held by the Applicant in its escrow account pending further orders of this Court;  (b) all cash in the Debtors' bank accounts as of the Conversion Date; (c) all cash deposits held by third parties and all accounts receivables;  and (d) all proceeds of vehicles and equipment that the Licking River Lenders/ SPV purchased via credit bid during the Chapter 11 portion of these cases (*see* Docs 1195, 1198, 1232).

B.      **Background of Applicant**

14.     The Debtors selected the Applicant as their financial advisor because of its experience and knowledge in the fields of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.  The Subsidiary Debtors filed their Motion to employ the Applicant as financial advisor on June 9, 2014 [Doc 30] (the "Original Employment Application"), and the Court entered an Interim Order [Doc 123] approving that Application on an interim basis on June 16, 2014.  On June 23, 2014, the Debtors filed their Motion [U.S. Coal Doc 23] (the "USC Employment Application") requesting authorization for

U.S. Coal to employ the Applicant on the same terms as stated in the Original GR Employment Application, and the Court entered an Interim Order [U.S. Coal Doc 69] approving that Application on an interim basis on June 27, 2014.

15.     On July 11, 2014, the Court entered Final Orders Authorizing the Employment of GlassRatner Advisory & Capital Group as Financial Advisor for the Debtors [Doc 277; U.S. Coal Doc 80] (together, the "Original Debtors' Final Employment Orders"), which approved both the Original and the USC Employment Applications and authorized all of the Original Debtors to retain and employ the Applicant as their financial advisor effective from the Relief Dates through the pendency of their bankruptcy cases.

16.     On November 4, 2014, the Additional Debtors filed their Motion [Doc 609] (the "Additional Debtors' Employment Application") requesting authorization for the Additional Debtors to employ the Applicant on the same terms as stated in the Original GR Employment Application. On November 19, 2014, the Court entered an Order [Doc 671] (the "Additional Debtors' Final Employment Order," and together with the Original Debtors' Final Employment Orders, the "Final GR Employment Orders") approving the Additional Debtors' GR Employment Application and authorizing the Additional Debtors to retain and employ the Applicant from the Petition Date through the pendency of their bankruptcy cases

17.     The Applicant has been employed by and acted as financial advisor for the Original Debtors since the Relief Dates for the Additional Debtors since the Petition Date. Copies of the Final GR Employment Orders entered in the lead case are attached hereto as Exhibit A.

### C.    Terms of Employment

18.    All charges for services rendered and for reimbursement of costs incurred are within the range of rates and in the amounts the Applicant customarily bills to and collects from other clients for similar services.  The Applicant believes that its services were necessary and reasonably likely to benefit the Estates at the time they were performed and that the amount requested as compensation for services is reasonable, and requests that the amount be approved on a final basis.

19.    The Applicant's professionals and paraprofessionals record the services they perform on daily time sheets and/or electronic time slips in six-minute increments.  The time entries are made substantially contemporaneously with the performance of the services described therein and are kept in the regular course of the Applicant's business.  The billing statements contain a reproduction of the time entries arranged chronologically by the U.S. Trustee's project categories and set forth the costs incurred and expenses advanced.  The billing statements are maintained in the ordinary course of the Applicant's business.  True and accurate copies of the billing statements for the Fee Period are attached hereto as Exhibit B.  The Applicant represents that the Debtors have reviewed the billing statements and have approved the requested amount.

20.    The Applicant made a number of voluntary rate and other reductions and exercised significant billing judgment in these cases.  Although not disclosed in the invoices, the Applicant did not bill the Debtors for certain services in its own discretion after reviewing the invoices in their totality and services performed.  In addition, GlassRatner voluntarily agreed (i) to reduce the hourly rate for Mr. Evan Blum (a Principal with GlassRatner and the senior professional advising the Debtors) from $575 to $525 starting on September 1, 2014, (ii) not to charge for non-working travel, and (iii) to reduce their total fee request by $7,500 as set forth in

the *Agreed Order Regarding Pending and Future Objections of the Committee and the U.S. Trustee to Fee Applications and Monthly Fee Statements of GlassRatner Advisory & Capital Group, LLC* (the "Agreed Interim Fee Order") [Doc. 1029].

21.     The Applicant received a pre-Relief Date retainer of $100,000.00 for services rendered and expenses incurred by the Applicant as financial advisor prior to filing of the Subsidiary Debtors' Consolidated Answer and Consent to Entry of Order for Relief and Reservation of Rights [Doc 8] (the "Subsidiary Answer") on June 9, 2014.  The Applicant applied the sum of $61,267.67 to the fees and expenses incurred prior to the filing of the Subsidiary Answer.  The Applicant holds the remaining $38,732.33 (the "Retainer") in its escrow account, as authorized by the Final GR Employment Orders.

22.     The Applicant submitted one prior application for allowance of interim compensation on November 14, 2014 [Doc 624] (the "First Interim Fee Application") in the amount of $700,630.89.  The U.S. Trustee filed an Objection [Doc 787] to the First Interim Fee Application on January 2, 2015 and the Committee filed an Objection [Doc 788] to the First Interim Fee Application on January 4, 2015.  GlassRatner responded to these objections on January 28, 2015 [Doc 852] (the "Interim Response"), which is incorporated herein by reference. In support of the Interim Response, GlassRatner also filed supporting affidavits from Michael P. Windisch (Doc. 1101) and John Collins (Doc. 1102), the Debtors' former CEO and CFO, each of which is also incorporated herein by reference in support of this Final Fee Application.  As set forth in the Agreed Interim Fee Order, the hearing on objections to the First Interim Fee Application and on any subsequent fee application filed by GlassRatner was to be combined with the hearing to consider final fee applications in these cases.

23.     Pursuant to the Interim Compensation Order, the Applicant has previously filed seven Monthly Fee Statements during the Fee Period. The Monthly Fee Statements were filed from June 12, 2014 through January 31, 2015. During the Fee Period, the Interim Compensation Order was vacated [Doc 985], and the Applicant has three unfiled fee statements for the periods February 1, 2015 – February 28, 2015, March 1, 2015 – March 31, 2015 and April 1, 2015 – April 24th, 2015 (the "Unfiled Period "):

| Fee Statement Period | Doc No. | Total Fee | 80% of Total Fee | Total Expenses | Amount Paid | Amount Unpaid |
|---|---|---|---|---|---|---|
| June 12 - July 30, 2014 | 422 | $349,161.40 | $279,329.12 | $25,487.28 | $304,816.40 | $69,832.28 |
| August 1 - 31, 2014 | 514 | $155,262.50 | $124,210.00 | $1,124.74 | $125,334.74 | $31,052.50 |
| September 1 - 30, 2014 | 585 | $161,792.30 | $129,433.84 | $7,802.67 | $137,236.51 | $32,358.46 |
| Voluntary Fee Reduction | 1029 | ($7,500.00) | ($6,000.00) | $0.00 | $0.00 | ($7,500.00) |
| October 1- 31, 2014 | 687 | $126,557.50 | $101,246.00 | $9,553.45 | $110,799.45 | $25,311.50 |
| November 1-30, 2014 | 784 | $159,929.80 | $127,943.84 | $5,716.24 | $66,830.04 | $98,816.00 |
| December 1-31, 2014 | 860 | $124,147.50 | $99,318.00 | $6,024.61 | $0.00 | $130,172.11 |
| January 1- 31, 2015 | 928 | $107,435.00 | $85,948.00 | $3,150.87 | $0.00 | $110,585.87 |
| February 1- 28, 2015 | NA | $134,045.00 | $107,236.00 | $7,648.83 | $0.00 | $141,693.83 |
| March 1-31, 2015 | NA | $131,802.50 | $105,442.00 | $5,529.69 | $0.00 | $137,332.19 |
| April 1-24, 2015 | NA | $41,920.00 | $33,536.00 | $2,624.52 | $0.00 | $44,544.52 |
| TOTALS | | $1,484,553.50 | $1,187,642.80 | $74,662.90 | $745,017.14 | $814,199.26 |

24.      No objections were filed to the Monthly Fee Statements for the periods of June

12, 2014 through November 30, 2014.   The Committee served an informal Objection to the

Applicant's Monthly Fee Statement for the period of December 1-31, 2014 on February 23,

2015, which was withdrawn without prejudice in the Agreed Order.   The time for objections to

the Monthly Fee Statement for the period of January 1-31, 2015 had not expired by the date that

the Court entered the Order [Doc 985] vacating the Interim Compensation Order.

25.      In conformity with the Interim Compensation Order and the Compensation

Procedures set forth therein, 80% of the charged fees and 100% of the reimbursable expenses set

forth in the Monthly Fee Statements for June 12, 2014 through October 31, 2014 have been paid

by the Debtors to the Applicant.   The Debtors have also paid the Applicant $66,830.04 towards

its Monthly Fee Statement for November 1-30, 2014.   The Debtors have not paid the remaining

portion of the Monthly Fee Statement for November 1-30, 2014 or any portion of the Monthly

Fee Statements for December 1-31, 2014 and January 1-31, 2014. The Debtors have not paid any

fees or expenses related to the Unfiled Period.

## II.      **RELIEF REQUESTED**

26.      Pursuant to the applicable provisions of 11 U.S.C. §§ 327 - 331 and Fed. R.

Bankr. P. 2016, the Applicant seeks final approval and allowance of the Total Request on

account of services performed and expenses paid by the Applicant as financial advisor to the

Debtors during the Fee Period.    Of the Total Request, $695,332.76 of compensation and

$49,684.38 of expenses were paid in accordance with the Interim Compensation Order.   The

total unpaid compensation is $789,220.74 ($158,554.74 of 20% holdback amounts and

$630,666.00 of unpaid fees) and the total unreimbursed expenses are $24,978.52.   Accordingly,

the total amount of unpaid compensation and unreimbursed expenses requested totals $814,199.26.

27.    GlassRatner seeks the allowance of a "gap claim" against the Subsidiary Debtors for fees and expenses incurred during the time period between June 9, 2014 and June 11, 2014 in the amount of $30,077.16 (the "Gap Claim").  GlassRatner asserts that this claim is a priority claim pursuant to 11 U.S.C. § 507(a)(3).

28.    GlassRatner also seeks allowance of the Gap Claim to apply to GlassRatner's retainer of $38,732.33 (the "Retainer") against such Gap Claim with any remaining Retainer to be applied against GlassRatner's allowed claims during the Fee Period.

A.    **Overview of Case Events**

29.    The early part of most chapter 11 cases is a chaotic period as the Debtor attempts to transition from a difficult and crisis oriented operating environment to a more normalized environment as a Debtor in Possession. GlassRatner aided the Debtors in this transition and brought structure to the process as the result of their formidable experience as restructuring advisors. The Debtors, which included ten legal entities, had complex capital structures at each of its two divisions. The divisions' operations were separately managed and reflected different mining dynamics, both from a production and sales perspective.

30.    GlassRatner prepared multiple cash collateral budgets to support the Debtors' use of cash collateral throughout these cases, which had to be supplemented, updated and modified at various times. The need for multiple cash collateral budgets was explained in detail in the Interim Response (¶¶ 27-33) and in the *Declaration of Evan Blum in Support of Debtors' Motion for Final Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Licking River Lenders, and (III) Granting Related Relief* (Doc. 365), which

declaration is incorporated herein by reference.  Management used these budgets in its oversight

function. GlassRatner prepared detailed presentations for the Committee professionals as well as

counsel for ECM and JAD Sellers, which provided transparency as to the Debtors' operations at

both Licking River and JAD. GlassRatner also populated an existing data room with substantial

financial information for the Committee, ECM and JAD Sellers.

31.     In the Fall of 2014, GlassRatner supported the Debtors with detailed financial

analysis and expertise in compiling plan projections. At Licking River, where outside capital was

likely necessary, potential investors were engaged in detailed term sheet negotiations, the terms

of which were discussed with ECM's counsel and investors. GlassRatner worked tirelessly to

create a structure that would incorporate an exit financing facility as part of a plan of

reorganization. Despite the diligent and responsible work of GlassRatner, forces beyond the

control of the professionals in this case, particularly the 22% decline in coal prices from case

inception through year end 2014, caused multiple global energy trading companies to reject

investment plans based on decisions made at global headquarters in the beginning of 2015.

32.     At JAD, a capital raise process was explored which would maximize creditor

recoveries and transition the division to new ownership, which was an important goal of such

lenders. Initially, it appeared that relatively little capital would be required to exit through a Plan

of Reorganization; however, due to unforeseen operational disruptions in the Fall of 2014, short-

term liquidity and near-term mining profitability did not create a runway to enable a feasible plan

of reorganization.

33.     Once the decision to cease operations at JAD and Licking River had been made,

GlassRatner expeditiously assisted in the Section 363 sale process and focused on maximizing

value under difficult circumstances. GlassRatner collected appropriate diligence materials,

identified and engaged potential buyers, and used its best efforts to obtain the highest and best price for the assets. GlassRatner also supported these sales by assisting Debtors' counsel in providing supporting documentation for the Asset Purchase Agreements (the "APA"). These transactions maintained mining operations and jobs, resulted in an ongoing customer for local businesses and mitigated significant liabilities.

34.    JAD's Section 363 auction resulted in the sale of equipment which satisfied approximately $8.3MM of secured claims and approximately $0.6MM of ad valorem taxes. Approximately $1.5MM of cure claims and $4.4MM of reclamation liability were relieved of the estate and assumed by the buyer as a result of the sale of JAD's mining assets. Additionally, GlassRatner identified the magnitude of value that a potential sale of SCANA's coal sales agreement could yield to the Estate, leading the Debtors and SCANA to settle for $2.0MM.

35.    Licking River's Section 363 auction resulted in the sale of equipment which satisfied approximately $11.0MM of secured claims and approximately $0.85MM of ad valorem taxes. Approximately $3.9MM of cure claims and $10.2MM of reclamation liability were assumed by the buyer as a result of the sale of Licking Rivers' mining assets.

36.    Once the lenders in these cases terminated the use of cash collateral, GlassRatner continued to work to strike a last minute deal to minimize the remaining claims of the estates, despite GlassRatner's awareness that the Debtors did not maintain the liquidity to make payments to professionals on an on-going basis. Throughout these cases, GlassRatner has focused on maximizing the value of the Debtors in an efficient manner with maximum transparency to all parties under extraordinary and difficult circumstances.

37.    GlassRatner's services were necessary and provided considerable benefit to the Debtors or were reasonably likely to benefit the Debtors at the time they were rendered.

18

Although the initial strategy to exit bankruptcy through a plan of reorganization was adjusted, it reflected an achievable approach and the best way to maximize value at the time and the work performed was absolutely necessary to engage with potential third party financing sources. It was in the context of a steep decline in prices and demand for coal, at a time of increasing regulatory uncertainty, as well as unforeseen mining condition deterioration that caused the temporary shutdown of mining operations. The expeditious commencement of the sale processes in relation to the shutdown of operations enabled a significant reduction in secured claims and other liabilities.

### B.    Summary of Services Rendered

38.    A detailed and itemized description of the services rendered and expenses incurred by the Applicant for the Fee Period is set forth in Exhibit B. The detail can be further described by project category consistent with the U.S. Trustee's Guidelines for the period June 12, 2014 – September 30, 2014 in the First Interim Fee Application [Doc 624, Exhibit C]. Detailed below are the amounts and descriptions of the services rendered, by project category, since the First Interim Fee Application which covers the time period from October 1, 2014 – April 24, 2015 (the "Post-Interim Period"):

b1.    Asset Analysis and Recovery
            Total Hours –  0
            Total Fees Requested - $0

39.    This category is intentionally left blank.

b2.    Asset Disposition
            Total Hours – 734.4
            Total Fees Requested - $290,465.00

40.     This category includes time expended with regard to the separate sale processes of the Debtors' JAD and Licking River Divisions. The sale processes consisted of six main categories as detailed below.

(a)     Contacting Potential Buyers: As part of the JAD sale process, GlassRatner contacted over 60 potential buyers, 38 of whom signed non-disclosure agreements and received access to the sale data room.  Of these 38 parties, 14 scheduled on-site visits. As part of the separate Licking River sale process, GlassRatner contacted over 55 potential buyers, 42 of whom signed non-disclosure agreements and received access to the sale data room.  Of these 42 parties, 2 scheduled on-site visits. As part of both sale processes, GlassRatner prepared various summaries of the prospective buyer lists and the status of the sales process which were shared with the Committee.

(b)     Providing Requested Information: In connection with providing due diligence materials, GlassRatner created a data room to provide information to potential buyers. The JAD data room incorporated 5 categories and approximately 495 total pages of documents, and the Licking River data room incorporated 6 categories and approximately 410 total pages of documents. For both sale processes, GlassRatner also provided additional requested documentation that was too large for the data room via thumb drive. GlassRatner prepared various *ad hoc* analyses and provided additional documentation based on the buyers' request lists, including, but not limited to, coal quality specs, historical cost figures, and violation summaries, as well as updates to claims analyses. Finally, detailed asset lists, in conformity with third party appraisals, were also prepared and provided.

(c)    <u>Potential Buyer Engagement</u>:  GlassRatner tracked all interested parties and continued to engage with each party in an effort to answer questions and provide requested documentation.

(d)    <u>Participate in Auction Process</u>:  GlassRatner reviewed appropriate sale related court filings and served sale notice to prospective buyers. In preparation for the auctions, GlassRatner prepared a reclamation liability schedule (by permit) which was used extensively in negotiations with potential purchasers of mining assets. GlassRatner held numerous discussions and meetings with potential bidders and participated in the auctions held in Lexington, KY. Finally, GlassRatner created spreadsheets to compare bids, which included detailed lien analyses related to the various credit bids. These analyses were used by the Debtors, its professionals and the Consulting Parties to analyze bids and their impact on the Debtor claims.

(e)    <u>Assist in Sale Process</u>:  GlassRatner spent considerable time reconciling the various assets auctioned and retained by the Estates, as well as updating tax and cure claim analyses related to the sales. GlassRatner assisted Debtors' Counsel in the negotiation and review of transaction terms and agreements as requested. GlassRatner created the APA schedules in the JAD transaction and reviewed and updated such schedules in the Licking River transaction.

(f)    <u>Disposition of Sale Proceeds</u>:  GlassRatner analyzed the remaining work that would need to be performed to wind down the Debtors' operations. This analysis was detailed in proposed liquidation budgets. GlassRatner prepared potential sources and uses of auction proceeds which were used in negotiations with the interested parties.

b3.    <u>Assumption/Rejection of Leases and Contracts</u>

Total Hours – 35.7
Total Fees Requested - $12,217.50

41.     This category includes time expended for the preparation and updating of a lease rejection analysis that was performed in conjunction with the Debtors and their counsel. GlassRatner prepared lists detailing all of the Debtors' contracts and leases, which included any scheduled claim, estimated gap period claim, estimated cure claim, estimated taxes due under the agreement, the key terms of the agreement, and the amount of any payments made under the agreement.

42.     Time in this category was also spent reviewing and advising the Debtors regarding contracts with SCANA, Sequoia Energy, LLC, and Kolmar Americas, Inc., as well as assessing fuel contracts.  GlassRatner's work in each of these matters was focused on performing various profitability analyses and assessing the resultant impact on the Debtors' cash flows. Other time spent in this category includes the analysis of royalty claims for the Debtors to assist with their attempts to negotiate cure claims and lower royalties.

b4.     <u>Avoidance Action Analysis</u>
        Total Hours – 0
        Total Fees Requested - $0

43.     This category is intentionally left blank.

b5.     <u>Budgeting (Case)</u>
        Total Hours – 0
        Total Fees Requested - $0

44.     This category is intentionally left blank.

b6.     <u>Business Operations</u>
        Total Hours –210.8
        Total Fees Requested - $87,095.00

45.     This category includes time expended for various ongoing operational issues encountered by the Debtors.  Approximately 60% of these costs were incurred in the month of December due to specific challenges faced by the each of the Debtors at that time.  At the JAD

Division, liquidity had become strained due to production short falls during the month of November. GlassRatner and the Debtors worked to identify steps that could be taken in order to mitigate significant variances from plan.   GlassRatner's work included preparing budget revisions and revised internal short-term cash flow forecasts in conjunction with the Debtors' management. It became clear that liquidity issues would require an immediate sale, and a process was commenced on  December 23, 2014 with the filing of proposed bidding procedures and related deadlines [Doc 729].

46.    At the Debtors' Licking River Division, the focus in December initially revolved around a potential reorganization of operations that might result in enhanced cash flow. As 2015 approached, liquidity forecasting became a particular concern given the amount of production exposed to rapidly declining market prices at the Licking River Division which was exacerbated by its lack of coal purchase contracts. As a result, GlassRatner engaged in discussions with the Debtors' management in order to update the Debtors' short-term budget and forecasts. By February, it became clear that the Licking River short term budgets were unattainable and that revisions were necessary. During that month, the Applicant worked with Licking River management to reassess its short term operations on a detailed production basis in order to assess its viability given the market conditions. By the end of February it became clear that a shutdown of operations was required, which occurred at Licking River on February 20th and 27th. The analysis of short term budgets during February at Licking River, and to some extent at JAD, accounted for approximately 25% of the total time in this category in this period.

47.    It should be noted that almost the entire amount of billed time for the preparation of the cash collateral budget for the thirteen weeks ended March 27, 2015 is effectively

contained in this category.   Work analyzing and forecasting short-term operations given the above liquidity issues was sufficient for the budget's underlying assumptions.

b7.    <u>Case Administration</u>
Total Hours - 70.5
Total Fees Requested - $33,192.50

48.    This category includes time expended for internal meetings regarding the status of the Debtors' bankruptcy cases and work to be performed by GlassRatner.   It also includes meetings and calls with the Debtors' management and counsel that covered multiple topics of immediate concern.   Also included in this category is preparation for and attendance at major hearings such as: JAD Debtors' bid procedures and authorization of JAD sale (3/17/15), status hearing on the sale of JAD and Licking River (3/31/2015), initial Licking River sale hearing and continuation of JAD sale hearing (4/8/2015) and the final Licking River sale hearing and conversion to chapter 7 hearing (4/20/2015).

b8.    <u>Claims Administration and Objections</u>
Total Hours –32.5
Total Fees Requested --$12,817.50

49.    This category includes time expended for quantifying and analyzing secured and general unsecured claims at both the JAD and Licking River Divisions.   This work was used to provide a recovery waterfall analysis to the Debtors' counsel per their request. An updated version of these analyses was included in the JAD and Licking River data rooms at the specific request of potential buyers. It also includes time for the preparation of an administrative claims analysis for both the JAD and Licking River Divisions, which was provided in compliance with Court Order.

b9.    <u>Corporate Governance and Board Matters</u>
Total Hours – 0
Total Fees Requested - $0

**This category is intentionally left blank.**

b10.   Employee Benefits and Pensions
           Total Hours – 0.4
           Total Fees Requested - $210

50.     This category includes time expended for the review of the key employee incentive plan for the Debtors' Chief Financial Officer, which GlassRatner analyzed with regard to its end-of-case claims presentation.

b11.   Employment and Fee Applications
           Total Hours – 46.5
           Total Fees Requested - $14,645.00

51.     This category includes time expended for preparation and review of monthly fee notices for September, October, November, December, January and February. Time in this category also includes preparation and review of the First and Second Interim Fee Applications.

b12.   Employment and Fee Application Objections
           Total Hours – 0
           Total Fees Requested - $0

52.     GlassRatner has not billed any time for the significant number of hours it has worked relating to the Objections to its First Interim Fee Application.

b13.   Cash Collateral and Post Petition Financing
           Total Hours –314.1
           Total Fees Requested - $133,972.50

53.     This category includes time expended related to raising debtor-in-possession financing, providing cash collateral budgets, and negotiating potential exit financing.  With regard to the Debtors' DIP financing efforts, GlassRatner prepared analytical materials, financial projections, and financing memoranda and made introductions to potential lenders. The Debtors' management, in particular the Chief Financial Officer, used this information in its discussions and negotiations with potential lenders and was responsible for negotiating the terms of DIP

financing proposals himself.  DIP financing-related work accounted for a minimal percentage of time expended in this category.

54.    Given the seven-month period of time covered by this Fee Application, three separate cash collateral budgets were required to be prepared. Cash collateral budgets were prepared for the period ending October 31, 2014, for the period ending January 31, 2015 and for the period ending March 27, 2015.  GlassRatner's work on cash collateral budgets involved forecasting key assumptions at the direction of the Debtors' management, which encompassed mining forecasts at each production site, shipping forecasts, staffing forecasts, and operations forecasts.  Time in this category also included preparation of two wind-down budgets for the thirteen weeks ended March 27, 2015 and for the four weeks ended April 24, 2014 which were required once cash collateral was terminated on March 1, 2015. Cash collateral and wind-down budget related work accounted for a significant amount of the time expended in this category. The work performed related to cash collateral budgets for the period ended March 27, 2015 is included in the Business Operations category.

55.    Time in this category also included negotiations with potential sources of exit financing. It should be noted that the modeling work related to such efforts is included in the Plan and Disclosure Statement (incl. Business Plan) category.  During this period of time, there were intensive discussions with multiple parties interested in providing exit financing in conjunction with a Plan of Reorganization at both the Debtors' Licking River and JAD Divisions.  GlassRatner spent a significant amount of time responding to detailed diligence requests and negotiating terms and conditions of potential financing.

b14.    <u>Litigation</u>
Total Hours – 0
Total Fees Requested - $0

56.     This category is intentionally left blank.

b15.   Meetings of and Communications with Creditors

Total Hours – 74.42
Total Fees Requested - $33,322.50

57.     This category includes time expended for responding to the Committee's questions and preparing documents requested by the Committee.  This included preparing a long-term financial projection presentation as requested by the Committee, on-site mine tours with the Committee, and multiple meetings with the Committee to discuss the financial performance of the Debtors, especially as liquidity and operational issues became exacerbated in December.

58.     Time in this category also includes calls with the Licking River secured lenders as it related to potential exit financing transactions at the Licking River Division. In regards to the sale process, GlassRatner reviewed JAD and Licking River bids received with the Committee as well as with the Consulting Parties. GlassRatner also reviewed the wind down and liquidation budgets, as well as potential global claims resolutions, with the Committee's financial advisor as well as with ECM and JAD Sellers' counsel. As such, time in this category includes providing responses to Committee and ECM counsel regarding Section 503(b)(9) and gap period claims.

b16.   Non-Working Travel

Total Hours – 0
Total Fees Requested - $0

59.     Intentionally omitted. As a courtesy to the Estates, GlassRatner is not billing for any non-working travel time.

b17.   Plan and Disclosure Statement (incl. Business Plan)
Total Hours – 372.8
Total Fees Requested - $137,724.80

60.     This category includes time expended for working with the Debtors to build long term projections for internal plan strategy, which was also used to assist the Debtors with efforts to raise capital from third parties.   The time billed in this category includes extending the Debtors' current three-year forecast by an additional six years so that potential investors could understand and evaluate a potential transaction. This was performed at the specific request of a potential investor.   The forecast incorporated a new long-term mining plan, a determination of appropriate level of mine staffing, the potential configuration of equipment, forecasts of operational costs that corresponded to each equipment spread, the required amount of bonding, and other key projection inputs. These long term projections were then summarized in presentations that were shared with multiple interested parties.

61.     Time in this category also incorporated significant diligence work performed for potential investors for each of the divisions.   Interested parties required certain additional analyses and information, which GlassRatner provided.   As transaction discussions progressed, further work was required to analyze and project various restructuring scenarios and how an investment would impact the capital structure and potential for a Plan of Reorganization.   Much of the work relating to the extension of the three-year forecast and the preparation of additional analyses requested by potential investors was accomplished during November and accounts for a substantial amount of time spent in this category.

62.     Time in this category also includes updating the Debtors' financial projections with actual results.   Periodic updates to the forecasts based on the most recent mining conditions were also required.   For instance, coal prices declined substantially during this time period. At the Licking River Division, significant reforecasts were requested as a result of such price declines; the coal spot market declined from $53 to $47 during the month of November, which

materially impacted the financial attractiveness of an investment and also created an inability to sell coal on a long term contractual basis past December. The reforecasts due to changes in mining conditions were required by potential investors in their internal approval process. At the JAD Division, projection updates due to mining conditions indicated that the operational dislocations would significantly impact the 2015-2016 time period and needed to be addressed immediately. At that time, in mid-December, the Debtors and its professionals, working with Committee professionals, determined that a Court supervised sale process was necessary and that a Plan of Reorganization was not feasible.

63.     During the beginning of 2015, once potential financing parties at the Licking River Division indicated that the decline in the coal pricing environment would most likely prevent a transaction from being consummated, GlassRatner consulted with the Debtors' Counsel and the Committee.  Pursuant to the Committee's request, further financial modeling and claims analysis was performed to evaluate whether a feasible Plan of Reorganization would be possible without a third-party investment.

b18.    Real Estate
            Total Hours – 0
            Total Fees Requested - $0

64.     This category is intentionally left blank.

b19.    Relief from Stay/Adequate Protection Proceedings
            Total Hours – 5.3
            Total Fees Requested - $2,452.50

65.     This category includes time expended for the review of adequate protection agreements and payments for parties such as Caterpillar Financial Services Corporation, The Huntington National Bank, Komatsu Financial, L.P., and Pryor Cashman LLP in order to assist the Debtors in budgeting appropriately.

b20.    <u>Financial Reporting</u>
> Total Hours – 52.1
> Total Fees Requested - $16,092.50

66.    This category includes time expended for the preparation and review of the Summary of Financial Affairs (the "<u>SOFAs</u>"), Schedules of Assets and Liabilities (the "<u>SOALs</u>") and the Global Notes to be filed with the Court by each of the four Additional Debtors.  This category also includes time for review and follow up discussions of the weekly variance reports prepared by the Debtors.

b21.    <u>Tax Issues</u>
> Total Hours – 6.9
> Total Fees Requested -  $2,152.50

67.    This category includes time expended for discussions related to the Debtors' net operating loss carry forward. It also includes time spent reviewing personal property taxes and severance taxes at both the JAD and Licking River Divisions in order to assess potential tax claims.

b22.    <u>Valuation</u>
> Total Hours – 160.3
> Total Fees Requested --$48,067.50

68.    This category includes time expended for the review of multiple appraisals and the preparation of a going concern and liquidation analysis and summary.  A third-party appraisal that valued the Debtors as a going concern was finalized in November.  It also valued specific assets that were not included in the Debtors' prior heavy machinery and equipment appraisal, such as the fee property and the prep plant.  Due to the complexity of the going concern appraisal and the changing mining assumptions provided by the Debtors, multiple draft iterations were prepared by the third-party appraiser, and extensive review was required by GlassRatner to verify key assumptions made in the appraisal.

69.     Time in this category also included GlassRatner's preparation of detailed liquidation analyses incorporating both the heavy machinery and equipment appraisal and the going concern appraisal, which analyses were provided to Debtors' counsel. These analyses provided the underlying data which was incorporated in the bid analysis used by the Debtors, their professionals and the Consulting Parties in the 363 sale at the JAD and Licking River Divisions.

b23.    Financial Analysis/Capital Structure
            Total Hours – 4.8
            Total Fees Requested - $1,410

70.     This category includes time expended for the analysis of secured debt at both the Debtors' Licking River and JAD Divisions and the preparation of a summary of such information that was provided to Debtors' counsel.

Summary

71.     The total time expended by the Applicant on behalf of the Debtors during the Fee Period was 3,912.2 hours, of which 1,781.7 represent the time from the First Interim Fee Application, and 2,130.5 represent the Post-Interim Period. The time is itemized on Exhibit B.

72.     In conclusion, the Applicant believes and represents that the compensation sought is reasonable based on the nature, extent, and value of such services, the time expended on such services, the cost of the comparable services rendered in cases other than bankruptcy cases, and the other factors adopted by the Sixth Circuit in the lodestar analysis of fee applications.

C.      **Necessary Expenses Incurred**

73.     Under 11 U.S.C. § 330(a)(1)(B), the Court may reimburse the Applicant for the "actual, necessary expenses" incurred in these cases.  In the course of its representation of the Debtors during the Fee Period, the Applicant incurred actual expenses in the total amount of

$40,248.21.  A detailed list of those expenses is included in <u>Exhibit B</u>.  By the Fee Application, the Applicant also seeks allowance and reimbursement for those actual, reasonable and necessary expenses incurred by the Applicant in representing the Debtor.

74.     The Applicant normally seeks and receives reimbursement of costs incurred for travel, hotels, meals, transportation, postage, teleconference services, and online research from its clients, and reimbursement of such costs is sought hereby.  The Applicant believes that all of the expenses requested are reasonable, necessary and appropriately reimbursable in these cases. The Applicant requests that this Court approve the reimbursement sought.

### III. CONCLUSION

75.     The Applicant respectfully submits that its Fee Application for final compensation in the total amount of $1,559,216.40 (including fees and expenses) constitutes a fair and reasonable request for the quality and nature of the services performed.

WHEREFORE, for all the foregoing reasons, pursuant to 11 U.S.C. §§ 328, 330 and 331, the Applicant prays that this Court enter an Order:

(a)     approving the Applicant's request pursuant to this Fee Application for final allowance of fees in the amount of $1,484,553.50 (of which $789,220.74 is unpaid) and expenses in the amount of $74,662.90 (of which $24,978.52 is unpaid) for the Fee Period, for a total allowed compensation of $1,559,216.40;

(b)     authorizing the Debtors to pay the Applicant the Outstanding Balance of all approved fees and expenses for the Fee Period as an allowed administrative expense of the Estates; and

(c)     Allowing the Gap Claim of GlassRatner in the amount of $30,077.16 as an allowed priority claim pursuant to 11 U.S.C. § 507(a)(3);

(d)      Permitting GlassRatner to apply the Retainer first against the Gap Claim until

such claim is satisfied in full, and any remaining Retainer against GlassRatner's

allowed fees and expenses during the Application Period; and

(e)      granting such other and further relief as this Court may deem appropriate.

## **CERTIFICATE OF APPLICANT**

I hereby certify that I have reviewed the foregoing Fee Application and the Exhibits attached hereto and that they are true and correct to the best of my knowledge and belief.

GlassRatner Advisory & Capital Services, LLC, Applicant

By: _____/s/ Evan Blum_____

Title:  Principal

Dated: May 15, 2015

Respectfully submitted,

_/s/ Elliot M. Smith_____
Stephen D. Lerner (Pro Hac Vice)
Elliot M. Smith (Pro Hac Vice)
Squire Patton Boggs (US) LLP
221 E. Fourth Street, Suite 2900
Cincinnati, Ohio 45202
Tel: (513) 361-1200
Fax: (513) 361-1201
Email: Stephen.lerner@squirepb.com
        Elliot.smith@squirepb.com

Counsel for GlassRatner Advisory & Capital Group, LLC

## CERTIFICATE OF SERVICE

This document has been electronically filed and served via the Court's ECF System on May 15, 2015.

/s/ Elliot M. Smith_____