**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND, LONDON AND LEXINGTON DIVISIONS**

| | | |
|---|---|---|
| IN RE | : | |
| | : | **Chapter 7** |
| **LICKING RIVER MINING, LLC,** *et al.* | : | **Case No. 14-10201** |
| | : | **Jointly Administered** |
| **Debtors** | : | |
| _____ | : | |

**MEMORANDUM OPINION AND ORDER GRANTING THE TRUSTEE'S
APPLICATIONS TO EMPLOY BARBER LAW PLLC, FOLEY & LARDNER, LLP AND
BINGHAM GREENEBAUM DOLL LLP**

When these cases converted to chapter 7, the Trustee, Phaedra Spradlin ("Trustee"), filed

applications to employ former Unsecured Creditor Committee ("Committee") counsel, Barber

Law PLLC ("Barber") and Foley & Lardner LLP ("Foley") as her general and litigation counsel.

Specifically, Foley was proposed to (a) represent the Trustee in an adversary proceeding it

originally filed on behalf of the Committee, Adv. No. 05-01004   ("Committee Litigation")

against Debtors' largest secured creditors, East Coast Miner LLC, East Coast Miner II LLC, Keith

Goggin and Michael Goodwin (collectively, the "Lenders"); and (b) render services on general

estate matters, principally in an advisory capacity, to the Trustee.   Barber was proposed to

represent the Trustee as her principal counsel and as local counsel to assist Foley in the Committee

Litigation.   Following objections, including from the Lenders, the Trustee revised Foley's

proposed retention to limit its engagement to litigation counsel in the Committee Litigation only

and she now seeks to employ Bingham Greenebaum Doll LLP ("BGD") as special counsel for

services described below.   Prior to the bankruptcies, BGD served as general counsel for the

Debtors but has not represented them during these cases.   During the cases, BGD represented

Lexon Insurance Co. and Bond Safeguard Insurance Co. (collectively "Lexon") as local counsel,

but has withdrawn from that representation.

Thus, pending before the Court are the Trustee's applications to employ (i) Barber, *nunc pro tunc* to April 27, 2015, as general and litigation counsel pursuant to §§ 372(a) and 328 [ECF No. 1321] ("Barber Application"), (ii) Foley, as of May 28, 2015, as Committee Litigation counsel pursuant to §§ 327(a) and 328 [ECF No. 1412], as revised [ECF No.1676 ¶ B.12.] ("Foley Application"), and (iii) BGD, *nunc pro tunc* to July 27, 2015, as special counsel pursuant to §§ 327(e) and 328 [ECF No. 1598] ("BGD Application" and together with the Barber Application and Foley Application, the "Applications").

The U.S. Trustee ("UST") filed objections to Barber's and Foley's employment applications because their pending final chapter 11 Committee counsel fee applications requested immediate payment of their allowed fees from a court-approved carve-out from the Lenders' collateral.   The UST asserted that because the Committee Litigation pending against the Lenders seeks, in part, to avoid the Lenders' liens, Barber's and Foley's request for immediate payment from the carve-out directly conflicts with the bankruptcy estates' position that the liens are invalid. According to the UST, the conflict arises because if the liens are invalid, the carve-out is invalid; and potentially, Barber and Foley may be required to disgorge any payments they receive from the carve-out.

The Lenders and Lexon also filed objections to Barber's and Foley's employment on similar grounds and further assert that through their administrative claims for chapter 11 professional fees, Barber and Foley hold interests adverse to the estates and materially adverse to other creditor classes.   The Lenders also object that Barber's and Foley's proposed services are duplicative.

The Barber and Foley Applications were initially taken under submission on August 7, 2015.   However, after the BGD Application was filed on August 27, 2015, to which the Lenders also object, the Court entered an order requiring the Trustee and BGD to provide clarification as to

the specific services to be rendered by each Applicant and the effect, if any, of BGD's proposed

employment on Barber's and Foley's proposed employment.   Barber, Foley, BGD (collectively,

the "Applicants"), and the Trustee filed a reply [ECF No. 1676] ("Joint Reply") clarifying, and as

to Foley, modifying, the Applicants' duties.

A hearing was held on September 10, 2015.   The UST advised its objections were

resolved by the pending BGD Application and Lexon withdrew its objections [ECF No. 1690].

The Lenders' objections remain pending as to all Applicants.   Following the hearing, the

Applications were taken under submission.

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).   Having reviewed the record and being

otherwise sufficiently advised, the Court will grant the Applications to the extent set forth herein.

## A.    BARBER'S AND FOLEY'S PRIOR EMPLOYMENT AS CHAPTER 11 COMMITTEE COUNSEL

As noted above, pre-conversion Barber and Foley were appointed as Committee counsel in

these cases and as such, provided services to the Committee to facilitate the performance of its

statutory duties under 11 U.S.C. § 1103.   Pursuant to a Final Cash Collateral Order (discussed

below) and with Barber's assistance, Foley undertook an extensive investigation of the Debtors'

prepetition transactions and potential causes of actions against third parties.   Foley's investigation

included reviewing and developing potential causes of action against the Lenders, who assert

prepetition claims against the Debtors in excess of $15,000,000 secured by liens on substantially

all of the Debtors' assets, and who are alleged to have been, at various times, board members,

common shareholders, equity shareholders and unsecured creditors of the Debtors.

On March 24, 2015, Foley, prepared and filed a detailed, fifteen-count complaint against

the Lenders in this Court, commencing the Committee Litigation.   The complaint asserts causes

of action against the Lenders for, among other things, equitable subordination of claims,

fraudulent transfers, director and officer liability claims, lien avoidance and preferential transfers.

Compensation to pre-conversion chapter 11 professionals, including Foley and Barber,

was provided by a consensual, court approved carve-out from the Lenders' collateral.   On

September 5, 2014, following the Committee's appointment, retention of counsel and several

weeks of negotiations and interim hearings, a Final Order (I) Authorizing Postpetition Use of Cash

Collateral, (II) Granting Adequate Protection to the Licking River Lenders, and (III) Granting

Related Relief [ECF No. 447] ("Final Cash Collateral Order") was entered, with the Lenders'

consent.

Pursuant to the Final Cash Collateral Order and an Order Establishing Procedures for

Interim Compensation and Reimbursement of Expenses of Professionals [ECF No. 337], interim

payments were made to Barber and Foley during the chapter 11 phase of these cases.   *See* 11

U.S.C. § 330 (court may award reasonable compensation to professionals employed under § 327).[1]

The Debtors' attempts to reorganize failed, in large measure due to a substantial and

precipitous decline in the coal market.   Unable to fund a plan or pay their administrative claims,

the Debtors engaged in an expedited sales process, selling the majority of their operating assets,

including credit bid sales to the Lenders.   On April 24, 2015, the chapter 11 cases were converted

to chapter 7 and on April 27, 2015, Ms. Spradlin was appointed as Trustee.

Barber and Foley, along with the other chapter 11 professionals, filed final chapter 11 fee

applications seeking final approval of their pre-conversion fees and requesting payment of any

approved unpaid balance from the Lenders' collateral pursuant to the carve-out provided for in the

Final Cash Collateral Order.   The Lenders raised a "procedural" objection to any payment from

---

[1] The Final Cash Collateral Order also conferred standing on the Committee to pursue the estates' claims against the
Lenders, if any, and provided a capped investigation budget in connection therewith.   [Final Cash Collateral Order
¶¶ 10, 21.]

their prepetition collateral, arguing that the carve-out was subordinate to Lenders' prepetition

liens.   On July 24, 2015, the Court overruled the procedural objection [ECF No.1558]

("Procedural Objection Order").   The Lenders' appeal of the Procedural Objection Order is

pending.

The Lenders also raised separate objections to the reasonableness of the final chapter 11

fee requests.   All reasonableness objections were settled.[2]   On August 21, 2015, a Memorandum

Opinion and Order Allowing Chapter 11 Professionals' Final Compensation and Payment from

Lenders' Collateral [ECF No. 1652] ("Final Fee Order") was entered approving the chapter 11

professional fees on a final basis and directing payment from the Lenders' prepetition collateral

pursuant to the Final Cash Collateral Order.   The Final Fee Order preserved the UST's and

Trustee's reservation of their "right to move for disgorgement at a future date should the facts so

warrant."   [Final Fee Order ¶ E.]   The Lenders' appeal of the Final Fee Order is also pending.[3]

## B.    THE CHAPTER 7 TRUSTEE'S EMPLOYMENT APPLICATIONS — BARBER AND FOLEY

Pursuant to the Barber and Foley Applications, as modified by the Joint Reply and Foley's

agreement with the Lenders, Barber and Foley's proposed services and compensation are as

follows:

1.   Barber's proposed engagement.

Pursuant to § 327(a), the Trustee proposes to employ Barber effective April 27, 2015, as

her principal general counsel.   Barber will be responsible for legal services necessary to assist the

Trustee in fulfilling her statutory duties, including such things as claims analysis/objections, stay

---

[2] With respect to Foley, the settlement with the Lenders included amendments to Foley's proposed compensation if its employment as the Trustee's counsel is approved.   Those amendments are discussed *infra* Section B.2.

[3] No stay pending appeal was sought and, with the exception of $53,709.50 of Foley's Investigation Budget fees which remain unpaid subject to further Court order, the allowed chapter 11 professional fees have been paid.   [*See* ECF No. 1696].

litigation and asset sales.   Barber will also serve as local counsel to Foley assisting it, as

necessary, in the Committee Litigation.   Barber's proposed compensation is on an hourly basis at

the rate of $275 per hour.   The Barber Application requests the Court to approve a $25,000

retainer, and authorize Barber to hold the retainer, subject to a valid and perfected security

interest/attorneys' lien, pending further Court order.

     2.   <u>Foley's proposed engagement</u>.

     The Trustee seeks to retain Foley, pursuant to §§ 327(a) and 328, for the limited purpose of

representing the estates in the Committee Litigation.   Foley is to be compensated on a

contingency basis of one-third of recoveries as defined in the Foley Application.   The

contingency fee will increase to 38.33 percent if the Committee Litigation is resolved only after an

appeal of a decision by the trial court.

     As agreed to with the Lenders as set forth in the status report filed by Foley [ECF No.

1555] ("Foley/Lender Fee Agreement"), Foley's proposed compensation will be adjusted as

follows:

> a.   If Foley is paid in cash for some or all of the Investigation Fees[4] ("Investigation Fee Payments"), Foley shall credit the amount of such Investigation Fee Payments against any contingent fee earned under the Foley Application, up to a maximum of $100,000;

> b.   Because the Investigation Fees are 33.47 percent of Foley's Allowed Chapter 11 Administrative Claim, any payment on Foley's Allowed Chapter 11 Administrative Claim shall be deemed to be an Investigation Fee Payment to the extent of 33.47 percent of such payment on the Allowed Chapter 11 Administrative Claim; and

> c.   If Foley's contingent fee is paid before payment of the Investigation Fees, a holdback from the contingent fee of up to $100,000 or other appropriate mechanism shall be put in place to ensure that Foley provides the up to $100,000 credit for the payment of any Investigation Fees.

[Foley/Lender Fee Agreement 2].

---

[4]  "Investigation Fees" is defined as Foley's fees in the amount of $203,709.50 for investigating the liens and claims of the Lenders.   [Foley/Lender Fee Agreement 1-2.]

Foley's employment proposal further provides that it shall advance the Trustee's expenses incurred in the Committee Litigation.

3.   <u>The Lenders' objections to the Barber and Foley Applications.</u>

The Lenders' contend that Barber's and Foley's employment cannot be approved because they do not meet the requirements of § 327(a).   In particular, the Lenders contend:

a.   Barber's and Foley's interests in the carve-out are materially adverse to the estates because their receipt of payments from the carve-out directly conflicts with the Trustee's efforts through the Committee Litigation to avoid the Lenders' alleged liens.   According to the Lenders, if their liens are avoided, then the carve-out is automatically avoided and Barber and Foley may be required to disgorge any payments approved and received under the Final Fee Order.

b.   Barber's and Foley's interest in the carve-out is adverse to other classes of creditors because in the absence of the carve-out, Barber's and Foley's fees, as chapter 11 administrative expenses would be (i) subordinate to all allowed chapter 7 administrative expenses, and (ii) *pari passu* with all allowed chapter 11 administrative expenses.

c.   Barber's and Foley's position on the scope of the carve-out is adverse to the Lenders and the Lenders' appeal of the Procedural Objection Order will not be resolved until the appeal process is complete.

d.   Barber is not entitled to receive a $25,000 retainer, and the estates have no unencumbered assets from which to pay such retainer.[5]

The Trustee responds that these alleged conflicts are remote and have no merit now because the Trustee seeks to engage BGD, in part, as conflicts counsel, such that Barber and Foley will have no role in evaluating or pursuing matters involving the carve-out.

---

[5] The Lenders' objection that Barber's and Foley's final fee applications presented an actual or potential conflict because of any alleged responsibility on their part to review and object, if appropriate, to their own fee applications, is mooted by the settlements as to reasonableness of the fees referred to above and entry of the Final Fee Order.

## C.  THE CHAPTER 7 TRUSTEE'S EMPLOYMENT APPLICATIONS — BGD

The Trustee advises that BGD's proposed retention is, in substantial part, to resolve issues raised in the objections to Foley's original Application.   The Trustee seeks to employ BGD as special counsel pursuant to §§ 327(e) and 328 to:

  i.   serve as conflicts counsel with sole responsibility to review and litigate carve-out related issues on behalf of the bankruptcy estates;

  ii.   conduct litigation other than the Committee Litigation;

  iii.   represent the estates on matters related to the Debtors' coal business, environmental and related matters; and

  iv.   assist Barber "on issues which he, as estate counsel who is representing 'the trustee in conducting the case,' may need additional resources unavailable to Barber as a sole practitioner."   [Joint Reply ¶ 5.]

BGD's proposed compensation is on a contingency basis similar to Foley's with respect to litigation matters and on an hourly basis for other matters at rates ranging from $210 to $530 per hour.   BGD will also advance the Trustee's expenses incurred in litigation matters.   Finally, the Trustee proposes to reimburse BGD for certain administrative expenses, such as long distance phone, postage, copies, and electronic research, at a flat rate of 2.5 percent of BGD's billed charges.

As explained by Foley and BGD in the Joint Reply and at the hearing on September 10, 2015, while Foley has responsibility for the Committee Litigation, BGD's services as litigation counsel may include assisting the Trustee with litigation against the Lenders on matters not included in the Committee Litigation.   In such event, BGD and Foley will work together to eliminate redundancy, share work product and share fees proportionately, or as otherwise agreed, to avoid any duplication of fees.

Prior to the commencement of these cases, BGD served as registered agent for many of the Debtors and provided them with legal advice related to corporate, environmental and regulatory issues.   BGD is not a creditor of Debtors and did not represent any of them during the cases.

With respect to its prior representation of Lexon, BGD has withdrawn from its representation of Lexon, and Lexon has withdrawn its objections to the Barber and Foley Applications.

The Lenders object to BGD's retention as special counsel, contending that BGD's proposed duties exceed the scope of § 327(e), and BGD is barred from representing the Trustee due to its representation of Lexon.

Finally, as to all Applicants, the Lenders argue that they have not adequately explained the division of services, there is duplication of services among the Applicants, it is unnecessary for the Trustee to employ three firms, and the estate lacks sufficient resources to employ all of the Applicants.

## D.     ANALYSIS AS TO THE BARBER AND FOLEY APPLICATIONS

The Trustee seeks to employ Barber and Foley under §§ 327(a) and 328.   Section 327 provides, in relevant part:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not *hold or represent an interest adverse to the estate, and that are disinterested persons*, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a) (emphasis added).

"Adverse interest" is not defined in the Bankruptcy Code, but it is often construed to mean:

> (1) to possess . . . an economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re Greystone Holdings, L.L.C.*, 305 B.R. 456, 461 (Bankr. N.D. Ohio 2003) (quoting *In re Fretter*, 219 B.R. 769, 777 (Bankr. N.D. Ohio 1998)).

The Bankruptcy Code defines "disinterested person" as one who:

> (A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

The requirements of § 327(a) are strictly construed in the Sixth Circuit. A "professional seeking to be hired 'can have neither an "adverse interest" nor be an "interested person."'" *In re BBQ Res., Inc.*, 237 B.R. 639, 642 (Bankr. E.D. Ky. 1999) (Howard, J.) (quoting *Michel v. Federated Dep't Stores, Inc. (In re Federated Dep't Stores, Inc.)*, 44 F.3d 1310, 1319 (6th Cir. 1995)). The Court cannot use its equitable powers to approve the employment of a professional who is not disinterested even if it determines that employment is in the best interest of all parties and even if such employment is the most efficient and economical way to proceed with administration of the case. *Michel v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 999 F.2d 969 (6th Cir. 1993); *Childress v. Middleton Arms, L.P. (In re Middleton Arms, Ltd. P'ship*, 934 F.2d 723 (6th Cir. 1991).

The Trustee, as the party seeking to employ the Applicants has the burden of proof to show that the proposed employment is proper. *See In re Running Horse, L.L.C.*, 371 B.R. 446, 451 (Bankr. E.D. Cal. 2007) (debtor seeking to employ counsel has the burden of proof to show that employment is proper). That said, deference should be given to the Trustee's choice of counsel if their retention is permissible. *In re Codesco, Inc.*, 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1982) ("[T]rustee should have wide latitude in determining who shall be employed to perform legal services for the estate. . . . Only in the rarest cases should the trustee be deprived of the privilege of selecting [her] own counsel." (quoting *Palmer v Kennedy, (In re Mandell)*, 69 F.2d 830, 831 (2d Cir. 1934))).

1. <u>Neither Barber nor Foley are creditors or other disqualified entities under
§ 101(14)(A) or (B).</u>

The Lenders refer to Barber and Foley as "creditors" of Debtors' estates.   Relevant

subsections of § 101(10) provide that "creditor" means:

> (A) [an] entity that has a claim against the debtor that arose at the time of or
> before the order for relief concerning the debtor;

> (B) [an] entity that has a claim against the estate of a kind specified in section
> 348(d) . . . of this title; . . . .

11 U.S.C. § 101(10).   The Lenders do not contend that Barber or Foley were prepetition creditors

under § 101(10)(A).

As to subsection (B), § 348, entitled "Effect of conversion," provides in subsection (d):

> (d) A claim against the estate or the debtor that arises after the order for relief
> but before conversion in a case that is converted under section 1112 . . . of this title,
> *other than a claim specified in section 503(b) of this title*, shall be treated for all
> purposes as if such claim had arisen immediately before the date of the filing of the
> petition.

11 U.S.C. § 348(d) (emphasis added).   Barber's and Foley's chapter 11 fee and expense claims

are § 503(b) claims.   *See* 11 U.S.C. § 503(b)(2) (allowed administrative expenses include

"compensation and reimbursement awarded under section 330(a) of this title").   Thus, their

claims are express exceptions to the rule that post-petition, pre-conversion claims are treated as if

they arose prepetition.   Neither Barber nor Foley are creditors of the bankruptcy estates.

Further, there is no claim that Barber or Foley are, or at any time were, owners or insiders,

or directors, officers or employees of any of the Debtors.   Thus, both Barber and Foley are

disinterested within the meaning of § 101(14)(A) and (B).

2. <u>Barber and Foley do not have material adverse interests within the meaning of
either § 101(14)(C) or § 327(a).</u>

Subsection (C) provides that a disinterested person:

> (C) does not have an interest materially adverse to the interest of the estate or of
> any class of creditors or equity security holders, by reason of any direct or indirect
> relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14)(C).

Lenders contend that Barber and Foley are not disinterested within the meaning of

§ 101(14)(C) because their administrative claims create an interest either adverse to the estates or

materially adverse to a class of creditors.

As noted above, an "adverse interest" means

> (1) to possess . . . an economic interest that would tend to lessen the value of the
> bankruptcy estate or that would create either an actual or potential dispute in which
> the estate is a rival claimant; or (2) to possess a predisposition under circumstances
> that render such a bias against the estate.

*Greystone Holdings*, 305 B.R. at 461 (quoting *Fretter*, 219 B.R. at 777).

> Courts have recognized that there is an overlap in the two prongs of section
> 327(a), persons holding or representing an "interest adverse" to the estate and
> persons who are not "disinterested," and observe that "they form one hallmark with
> which to evaluate whether professionals seeking court-approved retention . . . meet
> the absence of adversity requirements embodied in the Bankruptcy Code."

3 COLLIER ON BANKRUPTCY ¶ 327.04[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

(quoting *In re Vebeliunas*, 231 B.R. 181, 189 (Bankr. S.D.N.Y. 1999)).   "However, when

determining whether a professional holds a disqualifying "interest materially adverse" under

clause (C) of the definition of disinterested, courts have generally applied a factual analysis to

determine whether an actual conflict of interest exists."   *Id.* ¶ 327.04[2][a][i].   As reviewed in *In

re Midway Motor Sales,* 355 B.R. 26 (Bankr. N.D. Ohio 2006):

> In determining whether a professional has or represents an "adverse interest," one
> court observed:   "[I]f it is plausible that the representation of another interest may
> cause the debtor's attorneys to act any differently than they would without any
> other representation, then they have a conflict and an interest adverse to the estate."
> *In re The Leslie Fay Cos.,* 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994).   An actual
> conflict exists if there is "an active competition between two interests, in which one
> interest can only be served at the expense of the other."   *In re BH & P, Inc.,* 103
> B.R. 556, 563 (Bankr. D.N.J. 1989), *aff'd* in pertinent part, 119 B.R. 35 (D.N.J.
> 1990).   "As a general principle, professional persons employed by the trustee
> should be free of any conflicting interest which might, in the view of the trustee or
> the bankruptcy court, affect the performance of their services or which might
> impair the high degree of impartiality and detached judgment expected of them

during the administration of a case."   *In re Amdura Corp.,* 121 B.R. 862, 865
(Bankr. D. Colo. 1990), quoting COLLIER ON BANKRUPTCY ¶ 327.03 (1985).

*Midway Motor Sales*, 355 B.R. at 33 (alteration in original) (quoting *In re Git-N-Go, Inc.*, 321 B.R.

54, 58-59 (Bankr. N.D. Okla. 2004)).   "[I]nterests are not considered 'adverse' merely because it

is possible to conceive a set of circumstances under which they might clash."   *Greystone*

*Holdings*, 305 B.R. at 461 (quoting *In re Caldor, Inc.-NY*, 193 B.R. 165, 172 (Bankr. S.D.N.Y.

1996)).

Lenders argue that Applicants "unquestionably" hold interests materially adverse to

various parties in these cases because of their administrative claims.   Unquestionably, Barber and

Foley possess a pecuniary interest in the estates; however, not every pecuniary interest tends to

lessen the value of the bankruptcy estate.   If so, every professional would be adverse the moment

they commence services thereby incurring unpaid fees on behalf of the estate.   These fees will

always hold a priority over other classes of creditors as a matter of law.

> Furthermore, every lawyer has an inherent conflict with a client over fees.
> [Barber and Foley are] not expected to work for free.   The fact that [Barber and
> Foley are] already owed administrative expenses is no different from the fact that,
> once employed, [they] will have further claims against the estate for administrative
> expenses. . . .   In short, . . . [Barber's and Foley's] . . . performance can in no way
> be impugned by the fact that [each] holds an unpaid, contested, administrative
> expense claim against the [Debtors' estates].   Holding a contested, pre-conversion
> administrative claim for services rendered to the estate is not a disqualifying event
> for the employment of special purpose counsel[6] hired under 11 U.S.C. § 327(a).

> . . . . Likewise, with respect to the anticipated litigation with [the Lenders,
> Barber and Foley do] not hold any economic interest in the litigation that would
> tend to lessen the value of the estate, create a potential dispute in which the estate is
> a rival claimant, and [they do] not possess any predisposition that may result in a
> bias against the estate.

---

[6] Similar to Foley's employment here, in *Buffalo Coal* former committee counsel's proposed sole task was to
represent the chapter 7 trustee in litigation against a creditor.   Also similarly, counsel was being employed "as special
purpose counsel" under § 327(a) because it had not previously represented the debtor, and therefore, did not qualify
for employment under § 327(e).   *Accord In re Dev. Corp. of Plymouth, Inc.*, 283 B.R. 464, 467 (Bankr. E.D. Mich.
2002) (analyzing statute and finding that by its express terms, § 327(e) applies only to attorneys who have previously
represented the debtor).

*In re Buffalo Coal Co.*, No. 06-366, 2008 WL 1925152, at *7 (Bankr. N.D. W. Va. Apr. 30, 2008) (citations omitted).    Merely being in a different payment priority from other classes of creditors does not make Barber or Foley materially adverse to that class of creditors.

The Lenders further contend that Foley's administrative fee claim creates a predisposition that creates the potential for bias in the Trustee's litigation strategy.    The Lenders fail to explain this contention which the Court rejects.    Foley's proposed contingency fee engagement, insures that its interest are aligned with those of the Trustee to maximize the value of the estates. Moreover, to the extent that Foley is owed any remaining subordinated chapter 11 fees, this likewise incentivizes Foley's efforts in accordance with those of the estates and each class of creditors to maximize the value of the estates' assets.    All classes of creditors are served by the enhancement of the estates' value—neither Foley nor Barber can be said to have a contrary interest.

The Lenders further contend that Barber's and Foley's payment from the carve-out creates an interest either adverse to the estates or materially adverse to a class of creditors.    Specifically, the Lenders contend that Barber's and Foley's requests and payments from the carve-out directly conflict with the estate's position in the Committee Litigation that the Lenders' liens on cash collateral are "invalid."    They posit that if the liens are invalid, the carve-out is invalid and Barber and Foley could be required to disgorge fee payments they received.    Therefore, Barber and Foley have an interest in protecting, not avoiding the Lenders' liens, which interest is adverse to the estates and materially adverse to classes of creditors.    The Court rejects this position.

As reviewed above, a post-petition economic interest in the estate is not per se determinative of the adverse interest requirements of §§ 327(a) and 101(14)(C).    Does the carve-out change anything?    In and of itself, no.    *Cf. In re U.S. Flow Corp.*, 332 B.R. 792 (Bankr.

14

W.D. Mich. 2005) ("One must conclude that [a] valid and indefeasible court-created carve-out is not subject to disgorgement.").

Subsumed in the Lenders' argument is the notion that if their liens are avoided, the carve-out is likewise invalid.   The Lenders cite no authority for this position, and the impact of such action on the carve-out is far from clear.[7]   Such a potential conflict is too remote and speculative to prevent Barber's or Foley's employment.   Further, in the event issues of the carve-out's validity and/or disgorgement are raised, one of BGD's proposed duties is to serve as the Trustee's counsel with sole responsibility to review and, if necessary, litigate carve-out related issues.   This adequately alleviates any remote potential that Barber or Foley would be poised to bring an action for disgorgement against themselves.   *Cf. In re Pillowtex*, 304 F.3d 246, 254 (3d Cir. 2002) (counsel with potential conflict because of possible preference action was unlikely to bring an action against itself to recover preference).   Whether disgorgement of chapter 11 fees

---

[7] The carve-out was authorized by a final order from which no appeal was taken.   Lenders' offer no analysis of the effect of lien avoidance on the previously ordered carve-out.   Many liens, upon avoidance, are preserved for the benefit of the estate.   11 U.S.C. § 551.   If liens are preserved, is there a basis to "invalidate" a previously ordered carve-out from that lien?   "The principal reason for the preservation of avoided liens, . . . is to prevent 'junior lienors from improving their position at the expense of the estate when a senior lien is avoided.'"   5 COLLIER ON BANKRUPTCY ¶ 551.01[1] (quoting H.R. REP. NO. 95-595, at 376 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6332).   Other types of avoidance may have the effect of elevating junior liens:

> [T]he estate succeeds only to the priority that the avoided and preserved lien had with respect to competing interests.   Defects in the lien under state law, such as failure properly to perfect (or to continue perfection of) a personal property security interest or properly to record a real property lien, are not cured.   Avoidance and preservation of the lien do not remove the defect or enhance the avoided lien's priority under state law in comparison to competing liens on the same property.   The trustee, however, inherits the position of the entity whose lien was avoided and may assert any defenses that party may have had against junior lienholders.

> . . . [I]f the lien is avoided . . . as a preference under section 547 or as a fraudulent transfer under section 548, the estate steps into the shoes of the holder of the avoided lien and the lien's priority remains the same as it was with respect to other liens prior to the avoidance.

*Id.* at ¶ 551.02.

The Committee Litigation asserts causes of action against the Lenders for, among other things, equitable subordination of all of the Lenders' liens and claims; avoidance of fraudulent transfers; breach of fiduciary duty claims; avoidance of liens; and avoidance of preferential transfers.   The Lenders provide no authority for their position that the estates' successful avoidance of their liens under any of those theories invalidates the carve-out.   As *Collier* notes, some lien challenges *may* result in a finding of a defective (and thus, invalid lien) and *may* elevate a junior creditor's lien.   The Committee Litigation complaint asserts that the Lenders' hold defective liens with respect to specific isolated items of equipment or real property.

approved and paid from a secured creditor's collateral is subject to disgorgement is far from clear and certainly is unclear under the unusual circumstances presented in this case.   *See Greystone Holdings*, 305 B.R. at 461 ("[I]nterests are not considered 'adverse' merely because it is possible to conceive a set of circumstances under which they might clash." (quoting *Caldor*, 193 B.R. at 172)).   Neither Barber nor Foley have an interest materially adverse to the estates or to any class of creditors; thus they are disinterested within the meaning of § 101(14)(C) and meet the requirements for employment under § 327(a).

3.   The Trustee has not established the reasonableness of Barber's retainer.

Pursuant to § 328, counsel may be employed on any reasonable terms and conditions, "including on a retainer, on an hourly basis, . . . or on a contingent fee basis."   11 U.S.C. § 328(a). The Trustee has the burden of establishing the reasonableness of the terms and conditions of Applicants' employment but has failed to adequately explain why a retainer is necessary and the legal basis for the requested retainer, particularly where there remain unresolved disputes regarding the existence of unencumbered assets in the within estates.   Therefore, the Court will decline to approve the retainer.

## E.    ANALYSIS AS TO THE BGD APPLICATION

The Trustee seeks to employ BGD as special counsel under §§ 327(e) which provides:

(e)   The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).   Section § 327(e) sets up a three-prong test for employment of special counsel who has previously represented the debtor.[8]   First, employment of counsel may only be for a

---

[8]   *See Dev. Corp. of Plymouth*, 283 B.R. at 467 (analyzing statute and finding that by its express terms, § 327(e) applies only to attorneys who have previously represented the debtor).   As noted above, BGD served as Debtors' counsel prior to the bankruptcy cases being filed.

"specified special purpose" other than conducting the case.   Second, proposed counsel must not

represent or hold any interest adverse to the debtor or to the estate with respect to the matter on

which counsel is to be employed.   Finally, the employment must be in the best interest of the

bankruptcy estate.   *In re West Point Props., L.P.*, 249 B.R. 273, 284 (Bankr. E.D. Tenn. 2000).

The Lenders contend that BGD does not meet the requirements for employment under § 327(e).

1.   <u>Specified special purpose other than conducting the cases</u>.

The Lenders argue that BGD's proposed services are not for a "specified special purpose"

but rather that it is being employed to "conduct the cases" which would require BGD to be

employed under § 327(a).[9]

> The reference to "conducting the case" in section 327(e) includes those matters
> that form a part of the administration of the case under the Code.   In . . . a
> liquidation case, these matters may include examining the validity of liens and
> claims and collecting the assets of the estate when legal action is required.   Thus,
> an attorney retained as special counsel may receive compensation only for those
> services directly related to the limited scope of retention and not for services
> rendered generally to the debtor in connection with its bankruptcy case.   Attorneys
> who render services beyond the specified scope of their retention risk denial of
> compensation for such unauthorized services.
>
> . . . .
>
> Subsection (e) "does not authorize the employment of the debtor's attorney to
> represent the estate generally or to [sic] represent the trustee in the conduct of the
> . . . case."   Instead, the subsection authorizes employment of an attorney in certain
> cases, notwithstanding the attorney's prior connection with the debtor, in order to
> permit the estate to take advantage of that attorney's special knowledge and
> experience if it may substantially benefit the estate. . . .
>
> When an attorney is not disinterested but purports to act under the exception of
> section 327(e), approval by the court must be explicit; it cannot take the form of
> silent acquiescence by the court. . . .

3 COLLIER ON BANKRUPTCY ¶ 327.04[9][c], [d] (quoting *In re NRG Res., Inc.*, 64 B.R. 643, 647

(W.D. La. 1986)).   The phrase "conducting the case" is not defined by the Bankruptcy Code and

the Court has found little authority of what it entails, particularly in the context of a chapter 7

---

[9] BGD has not applied for employment under § 327(a); therefore, that issue is not before the Court.

case.[10]   Common sense and what little case law is available, suggest that the phrase encompasses the gambit of legal services necessary to the Trustee's performance of her duties set forth in 11 U.S.C. § 704.

BGD's proposed retention is for several "specified special purposes."   However, "[t]he fact that there are several special purposes does not cause th[ose] purposes to lose their identity as special purposes."   *DeVlieg-Bullard, Inc. v. Natale (In re DeVlieg, Inc.)*, 174 B.R. 497, 501 (N.D. Ill. 1994) (alterations in original) (quoting and affirming bankruptcy court's decision), *appeal dismissed for lack of jurisdiction*, 56 F.3d 32 (7th Cir. 1995).   Thus, merely because its retention is for multiple purposes, does not prevent BGD's employment under § 327(e) if each purpose is a specified special purpose.

As noted above, the purposes for which BGD is to be employed are to:

   i.   serve as conflicts counsel with sole responsibility to review and litigate
        carve-out related issues on behalf of the bankruptcy estates;

   ii.  conduct litigation other than the Committee Litigation;

   iii. represent the estates on matters related to the Debtors' coal business,
        environmental and related matters; and

   iv.  assist Barber "on issues which he, as estate counsel who is representing 'the
        trustee in conducting the case,' may need additional resources unavailable to
        Barber as a sole practitioner."   [Joint Reply ¶ 5.]

The Lenders argue that BGD's duties are not "specified" and in particular, it is unclear what litigation will be handled by BGD because the matters are not listed and BGD's application indicates that it may handle some litigation against the Lenders.   The fact that the Trustee has not yet determined what actions should be pursued against a specific list of parties does not make BGD's employment as litigation counsel any less a special purpose.   Further, its services as

---

[10] In an unreported decision marked as not intended for publication or citation, one court found that the chapter 7 trustee's application to employ counsel must be considered under § 327(a) because counsel's "special purpose" employment was "in furtherance of the Trustee's duties under the Bankruptcy Code and therefore constitutes assistance in 'conducting the case,' which makes [it] employment under § 327(a)."   *In re Martin Designs, Inc.*, No. 08-60431, 2013 WL 1195706, at *4 (Bankr. N.D. Ohio Mar. 22, 2013).

counsel on issues related to, *and limited to*, the carve-out, coal industry and environmental matters are likewise specified special purposes.

With the exception of item (iv), the Court finds Lenders' position without merit.   In proposing to assist Barber in his position as general counsel on essentially any issue on which he needs assistance, it is difficult to see how BGD's services will not constitute "conducting the case."   "Any attorney retained to advise and assist the [trustee's] general counsel is necessarily involved in 'conducting the case' and therefore must be 'disinterested.'"   *Running Horse*, 371 B.R. 452 (where proposed counsel was not disinterested and therefore ineligible for employment under § 327(a), the chapter 11 debtor was not permitted to retain such counsel for "special purpose" under § 327(e) to assist debtor's general bankruptcy counsel in matters that constituted "conducting the case").   BGD's own description of the proposed services indicates it will assist Barber in conducting the case.   These proposed services are in direct conflict with § 327(e), and BGD's engagement for this purpose will not be approved.

> 2.   Interest adverse.

The Lenders' contention that BGD's representation of Lexon as local counsel is an interest adverse to the Debtors or the estates, is resolved by BGD's withdrawal from such representation. BGD also represented other creditors during the chapter 11 phase of the cases but states that all of such matters have been concluded and that it "does not represent any entity with respect to any matter on which it is being retained which is adverse to the Estates or Debtors."   [BGD Appl. Ex. A ¶ 6.a.]

> 3.   Best interest of the estates.

The Court finds that BGD's employment for the specific purposes stated in items (i) through (iii) above is in the best interest of these bankruptcy estates.   Contrary to the Lenders' assertions, the retention of BGD has the potential of conserving the estates' resources.   BGD

served as prepetition counsel to the Debtors and has expertise in their business structures and

environmental matters.   Contrary to the Lenders' arguments that the services of Foley and BGD

are duplicative, unclearly defined and will result in excessive fees, the Court finds that (i) the

Trustee is an experienced chapter 7 trustee well able to supervise her counsel and their specific

duties, (ii) counsel themselves are seasoned professionals who understand the risk of reduced

compensation in the event of performing unnecessary services and who have stated in their

pleadings and on the record their commitment to avoid duplication of effort and imposition of

unnecessary services and fees on the estates, and (iii) final fees, contingent or hourly, remain

subject to approval by this Court.   *See generally*, 11 U.S.C. § 330(a) (court may approve

reasonable compensation for necessary services).

BGD meets the requirements to be employed as special counsel under § 327(e).

4.   Terms of Engagement.

Finally, the Lenders profess ignorance of the specifics of the hybrid compensation which

the Trustee proposes for BGD.   As these matters, particularly the litigation matters, are not yet

identified, the Court reserves until ruling on BGD's fee applications whether BGD's terms of

compensation will be awarded on an hourly lodestar or contingency fee basis.

**F.    ORDER**

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to

Federal Rules of Bankruptcy Procedure 9014(c), 7052.   Based on the foregoing,

IT IS HEREBY ORDERED that the Barber Application [ECF No. 1321] is APPROVED

as set forth herein.   Pursuant to § 327(a), the Trustee is authorized to employ and retain Barber as

of April 27, 2015, as general and litigation counsel upon the terms and conditions set forth in the

Barber Application; provided, however, the Trustee's request to pay Barber a retainer in the

amount of $25,000 is DENIED.

IT IS FURTHER ORDERED that the Foley Application [ECF No. 1412] is APPROVED as set forth herein.   Pursuant to § 327(a), the Trustee is authorized to employ and retain Foley as of May 28, 2015, as special litigation counsel with respect to the Committee Litigation.   Foley will be compensated in accordance with the contingency arrangements set forth in the Foley Application, adjusted as follows per the Foley/Lender Fee Agreement [ECF No. 1555]:

> a.   If Foley is paid in cash for some or all of the Investigation Fees ("Investigation Fee Payments"), Foley shall credit the amount of such Investigation Fee Payments against any contingent fee earned under the Foley Application, up to a maximum of $100,000;

> b.   Because the Investigation Fees are 33.47 percent of Foley's Allowed Chapter 11 Administrative Claim, any payment on Foley's Allowed Chapter 11 Administrative Claim shall be deemed to be an Investigation Fee Payment to the extent of 33.47 percent of such payment on the Allowed Chapter 11 Administrative Claim; and

> c.   If Foley's contingent fee is paid before payment of the Investigation Fees, a holdback from the contingent fee of up to $100,000 or other appropriate mechanism shall be put in place to ensure that Foley provides the up to $100,000 credit for the payment of any Investigation Fees.

Foley's contingency fees shall remain subject to final Court approval.

IT IS FURTHER ORDERED that the BGD Application [ECF No. 1598] is APPROVED as set forth herein.   Pursuant to § 327(e), the Trustee is authorized to employ and retain BGD as of July 27, 2015, as special counsel for the following purposes:   (i) to serve as conflicts counsel with sole responsibility to review and litigate carve-out related issues on behalf of the bankruptcy estates; (ii) to conduct litigation other than the Committee Litigation; and (iii) to represent the estates on matters related to the Debtors' coal business, environmental and related matters.

The Court reserves the issue of whether and for which matters BGD will be compensated on an hourly lodestar or contingent fee basis and further reserves on whether BGD's proposed administrative fee described in the BGD Application will be approved.

IT IS FURTHER ORDERED:

1.      To the extent of any inconsistency between the terms of the Applications and this Memorandum Opinion and Order, the terms of this Memorandum Opinion and Order shall govern.

2.      The Trustee is authorized, empowered and directed to take all actions necessary to implement the relief granted in this Memorandum Opinion and Order.

3.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Memorandum Opinion and Order.

22

The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.



Signed By:
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Tuesday, September 22, 2015**
**(tnw)**